THE STATE ex rel. HENRY J. WESTHUES, Prosecuting Attorney; JOHN C. HALL and R. T. WOOD, Interveners, v. JOHN L. SULLIVAN, Secretary of State; FRANK W. McALLISTER, Attorney-General, and MAURICE J. CASSIDY et al., Interveners, Appellants.

State ex rel. Westhues v. Sullivan.

In Banc, July 12, 1920.

1. **PROSECUTING ATTORNEY: Suit in Name of State: Referendum Petition.** The prosecuting attorney can bring a suit in the name of the State only when the matters involved are such as concern the State in the limited territory over which he has control. The Prosecuting Attorney of Cole County cannot use the name of the State to prevent the reference of a state law to the legal voters at a general election by an injunction suit brought against the Secretary of State and the Attorney-General; for while their acts which he seeks to restrain would be performed in his county, that does not so localize the real subject-matter of the suit as to authorize him to act in the name of the State.

2. ———: ———: ———: **Misjoinder: Taxpayers as Interveners: Waiver.** Notwithstanding the suit to enjoin the Secretary of State and Attorney-General from accepting and filing petitions asking that a certain legislative act be referred to the legal voters for their approval or rejection was wrongfully brought in the name of the State by the prosecuting attorney as relator, yet if after the petition was filed taxpayers were permitted to intervene as defendants, and other taxpayers and citizens intervened as plaintiffs and they adopted the petition, and defendants' demurrer charging misjoinder was overruled, defendants by answering over waived the question of misjoinder, and waived the question whether the State had an interest in the suit, and waived all other questions arising from the face of the petition except those of jurisdiction and failure to state a cause of action; and it being conceded that taxpayers and citizens could, at the proper time, have maintained the suit, the petition is entertained.

3. **PREMATURE SUIT: Referendum Petitions: Injunction Against Attorney-General.** A suit to enjoin the Secretary of State from filing petitions asking that a legislative act be referred to the legal voters and to enjoin the Attorney-General from preparing the ballot title for such act, is prematurely brought as to the Attorney-General. He only prepares such title after the petitions for the referendum are filed, and where the petition alleges that the Secretary of State is threatening to file the petitions, but does not allege that he has filed them, the injunction suit against the Attorney-General should be dismissed.

4. ———: ———: **Injunction Against Secretary of State.** The statute (Sec. 6750, R. S. 1909) provides that an injunction may be maintained against the Secretary of State if he accepts and files a legally insufficient referendum petition, which means that the right to enjoin him from certifying or printing the measure on the official ballot does not arise until the alleged insufficient peti-

tions have been accepted and filed by him; and a suit in which the petition alleges that he is threatening to file certain referendum petitions, but does not allege that he has filed any of them, is premature. The right of action follows, and does not precede, his acts. The purpose of the statute is to correct wrongful official action, not to prejudge or prevent official action.

5. **REFERENDUM: Emergency Clause.** The Legislature cannot foreclose the constitutional right of referendum by simply adding an emergency clause to a legislative act. [WALKER, C. J., dissenting.]

6. ———: ———: **Public Peace, Etc.** An emergency clause added to a legislative act which does not state that it is a law "necessary for the immediate preservation of the public peace, health or safety" does not affect the question of the legality of its reference to the voters. [WALKER, C. J., dissenting.]

7. ———: ———: **To What Acts Applicable.** The words of Section 57 of Article IV of the Constitution declaring that the people reserve to themselves "power at their own option to approve or reject any act" of the Legislature are important, and they mean that any act passed by the Legislature, whether or not it contains an emergency clause, may be referred to the people unless it is, in fact, a law "necessary for the immediate preservation of the public peace, health or safety" or is an appropriation bill of the kind mentioned in said Section 57. [WALKER, C. J., dissenting.]

8. ———: ———: **Immediate Force and Effect of Legislative Act.** The force and effect of Sections 57 and 36 of Article IV of the Constitution, when read together, as they must be in order to harmonize them, is to withdraw from the Legislature, power, by an emergency clause or otherwise, to put into immediate effect and operation any measure subject to the referendum. Section 57, by declaring that "any act" may be referred except laws specifically excepted by it, covers measures which prior to its adoption were subject to an emergency clause; and all measures not excepted by Section 57 are not subject to an emergency clause, but become effective only at the end of ninety days after adjournment of the session, and not then if proper referendum petitions have been filed. [WALKER, C. J., dissenting.]

9. ———: ———: ———: **Oregon Decision.** Missouri borrowed the initiative-and-referendum provision of her Constitution from Oregon, and borrowed it after the ruling of the Supreme Court of that State in Sears v. Multomah County, 49 Ore. l. c. 44, and therefore the ruling in that case becomes very material as an interpretation of the provision; and in that case, in construing sections of the Oregon Constitution similar in all respects to Sections 36 and 57 of the Missouri Constitution, the Supreme Court of Oregon

ruled that no legislative act subject to referendum can be put into force by the Legislature until the ninety days in which referendum petitions may be filed have expired, and that the adding of an emergency clause to the act will not have the effect of putting it into immediate operation. It is, therefore, *held*, that the Legislature cannot give immediate effect to any measure subject to referendum, by an emergency clause or otherwise, but that all acts of the Legislature except those "necessary for the immediate preservation of the public peace, health or safety," etc., are suspended in their operation for ninety days after the adjournment of the session of the Legislature at which they are enacted and, if proper referendum petitions are filed within the ninety days, until they are approved by the votes of the people; but, by an emergency clause, the Legislature may give immediate effect to non-referable laws. This is the meaning of Sections 36 and 57 of Article IV of the Constitution when read together. [WALKER, C. J., dissenting.]

10. ———: **Necessary for Public Peace: Workmen's Compensation Act.** The Workmen's Compensation Act of 1919, in Section 81, declared, "It being necessary for the commission herein created to be fully organized and make preliminary preparations, and there being an immediate necessity therefor," etc. *Held*, that these expressions do not amount to a legislative declaration that the act was one "necessary for the immediate preservation of the public peace, health or safety." [WALKER, C. J., dissenting.]

11. ———: ———: **Legislative Declaration.** *Held*, by GRAVES, J., with whom WOODSON, J., concurs, that a declaration of the Legislature in an act passed by it that the act is "necessary for the immediate preservation of the public peace, health or safety" is not final, nor is it binding on the courts, and will not be given effect unless it can fairly be said that the act is necessary for such a purpose. The provision by which the people "reserve power at their own option to approve or reject at the polls any act of the legislative assembly" except "laws necessary for the immediate preservation of the public peace, health or safety," etc., is a constitutional right, which cannot be taken from them by an over-anxious or hostile Legislature. If the Legislature by declaring the necessity to exist can take away the right, then it becomes a legislative referendum, and not a constitutional referendum. [WALKER, C. J., dissenting; BLAIR, WILLIAMS, GOODE and WILLIAMSON, JJ., holding that the question is not involved in this case, and therefore express no opinion.]

12. ———: ———: ———: **Decisions Pertaining to Emergency Clauses.** *Held*, by GRAVES, J., with whom WOODSON, J., concurs, that the decisions of courts ruling that a legislative declara-

tion that an emergency existed was final on the courts, the only question involved in them being when a law became effective and therefore not a matter of substance, have no application to a proper interpretation of the "peace and safety" clause of the initiative-and-referendum provisions of the Constitution. [WALKER, C. J., dissenting.]

13. ———: ———: ———: Discretion. *Held*, by GRAVES, J., with whom WOODSON, J., concurs, that courts have always exercised their constitutional duty to review acts of the Legislature passed in the exercise of their legislative discretion, in all cases except where it explicitly appears from the Constitution that the grant of such discretion was exclusive; and since the initiative-and-referendum provision of the Constitution explicitly says that the people "reserve power at their own option to approve or reject at the polls any act of the legislative assembly" except "laws necessary for the immediate preservation of the public peace, health or safety;" etc., the courts review a legislative declaration that the necessity exists just as they do any other statute which involves a constitutional construction, and will not permit such a declaration to defeat a reference to the people unless it appears from the face of the act that the necessity does in fact exist. [WALKER, C. J., dissenting; BLAIR, WILLIAMS, GOODE and WILLIAMSON, JJ., holding that the question is not involved in this case and therefore express no opinion.]

14. ———: ———: ———: Immediate Preservation. *Held*, by GRAVES, J., with whom WOODSON, J., concurs, that the words "necessary for the immediate preservation" found in the initiative-and-referendum provision of the Missouri Constitution are of vital importance in measuring the necessity for a legislative act. Many acts may be necessary to the public peace, health or safety that are not necessary for the "immediate preservation" of either. [WALKER, C. J., dissenting; BLAIR, WILLIAMS, GOODE and WILLIAMSON, JJ., holding that the question is not involved in this case and therefore express no opinion.]

15. ———: Petitions: Questioning Signatures. Where legal voters have signed a petition for a referendum to which was attached the legislative act, they are in no position to question their signatures, any more than one could question his signing of a note which he did not read. [WALKER, C. J., dissenting.]

16. ———: ———: Withdrawal of Names: By Letter. After a referendum petition has been signed and the circulator has made affidavit thereto the signers cannot withdraw their names, either

before the petition is filed with the Secretary of State or afterwards, except by an act equally as formal. A mere postal card or letter purporting to be signed by a signer of the petition is not sufficient to withdraw his name. [WALKER, C. J., dissenting.]

17. ———: Number of Signers. The Constitution requires that referendum petitions, in order to be sufficient, must be signed by at least five per cent of the legal voters in each of two-thirds of the Congressional districts, which at the present time means eleven districts; and if the petitions are signed by five per cent of the legal voters in each of eleven districts, it is immaterial whether they are signed by such number in other districts.

18. ———: Legal Voters: Registration. The signers of initiative or referendum petitions are not required to be registered voters, if they otherwise possess the constitutional qualifications of. legal voters. Returned soldiers, whose names do not appear on the registration books, but are entitled to register and to vote on the referendum measure and all other propositions at the next general election, are "legal voters" within the meaning of those words as used in Section 57 of Article IV of the Constitution, and if they sign such petitions their names should be counted. [WALKER, C. J., dissenting.]

19. ———: ———: ———: Police Regulation. Registration does not add to or detract from the qualifications of a voter, but is a mere reasonable police regulation applicable to the act of voting only, designed to guard against fraud or intimidation or for identifying the voter and preserving his right to vote. [WALKER, C. J., dissenting.]

20. ———: Residence in District: Affidavit. A petition which only attacks the verification affidavits attached to a referendum petition as being insufficient, in that they fail to state the Congressional district in which the signer resides, does not raise the question that the voter does not reside in a particular district, for the statute does not require that the affidavit state the Congressional district in which the signer resides. Besides, in this case, in which there were two Congressional districts wholly in the City of St. Louis, the affidavits attached to the referendum petitions stated that each signer had "stated his name, post-office address and residence correctly," and opposite each signer's name was placed his street address, and it was proven that 2589 of these street addresses were in one of such Congressional districts and 2519 were in the other, which numbers made each petition good so far as the number of signers was concerned. [WALKER, C. J., dissenting.]

21. ———: **Affidavit: Before Signer.** The validity of a referendum petition is not affected by the fact that the affidavit of the circulator was made before a notary public who had signed the petition as a legal voter. The notary has no such interest in the matter as precludes him from administering the oath to the circulator. [WALKER, C. J., .dissenting.]

Appeal from Cole Circuit Court.—*Hon. J. G. Slate, Judge.*

REVERSED.

*Frank W. McAllister*, Attorney-General, and *C. P. LeMire*, Assistant Attorney General, for appellants; John M. Atkinson, for intervening appellants.

(1) The court erred in not sustaining appellants' demurrer to relator's amended petition on the ground that said Henry J. Westhues, as Prosecuting Attorney of Cole County, has no legal authority in law to bring this action in the name of and on behalf of the State. Secs. 6750, 1007, 970, R. S. 1909; State ex rel. v. Williams, 221 Mo. 261; State ex rel. v. Lamb, 237 Mo. 450, 454; State ex rel. v. Carter, 257 Mo. 78; State ex rel. v. Metscham, 32 Or. 372; Allen v. State, 130 Pac. 1115. (2) The court erred in not sustaining appellants' demurrer to relator's first amended petition on the ground that this action was prematurely brought, and that appellant, Frank W. McAllister, as Attorney-General, was improperly made a party defendant. Secs. 6750, 6751, R. S. 1909; State ex rel. v. Carter, 257 Mo. 78. (3) The court erred in sustaining the conclusions of law, as made by said master, that said Workmen's Compensation Act was not a subject to the referendum. provisions of Section 57 of Article 4 of the Constitution and could not be referred. Sec. 1, Art. 4, Constitution of Oregon; State ex rel. v. Carter, 257 Mo. 68, 70, 72; Sec. 36, Art. 4, Constitution of Missouri; Kadderly v. Portland, 44 Ore. 147; Sears v. Multnomah County, 49 Ore. 45; Bennett Trust Co. v. Sengstacken,

58 Ore. 333; State ex rel. v. Moore, 103 Ark. 53; Harrison v. Hodges, 109 Ark. 477; In re Manefee, 22 Okla. 365; Norris v. Cross, 25 Okla. 287; Attorney-General v. Lindsay, 178 Mich. 524; State v. Meath, 84 Wash. 302; State v. Howell, 85 Wash. 281; State v. Clausen, 85 Wash. 260; In re Interrogatories by the Governor, 181 Pac. (Colo.) 199; State ex rel. v. Whisman, 36 S. D. 260, L. R. A. 1917D-1; State ex rel. v. Olcot, 67 Ore. 214; Berkis v. Lincoln Belt Co., 260 Ill. 450; In re Hoffman, 155 Cal. 248; McClure v. Nye, 22 Cal. App. 248; Rigdon v. San Diego, 30 Cal. App. 107; Riley v. Cariso, 27 Okla. 33; Simpson v. Gage, 195 Mich. 581. (4) The court erred in sustaining the findings of fact and conclusions of law of said master that the term "legal voter" as used in said Section 57 of Article 4 of the Constitution should be construed to mean "registered voter," and in admitting incompetent evidence and finding from such evidence that all referendum petitions in the 5th and 15th Congressional Districts were legally insufficient. Sec. 2, Art. 8, Constitution of Missouri; State ex rel. v. Olcott, 67 Ore. 220; Woodward v. Barbur, 59 Ore. 75; State ex rel. v. Mason, 153 Mo. 506; In re Herman, 96 N. Y. Supp. 144, 108 App. Div. 335; Sec. 57, Article 4, Constitution of Missouri; Sections 1, 4, 6, Art. II, Constitution of New York. (5) The court erred in sustaining the findings of fact and conclusions of law of said master that Section 57 of Article 4 of the Constitution and Sec. 6749, R. S. 1909, should be construed to require all affidavits of circulators to all referendum petitions in the 11th and 12th Congressional districts to contain the additional statement in the affidavit of the circulator that all signers on said referendum petitions reside in each of said respective Congressional districts, and finding that under the evidence all of said referendum petitions in said 11th and 12th Congressional districts were not legally sufficient. Secs. 6747, 6748, 2737, 3738, R. S. 1909; Stealey v. Kansas City, 179 Mo. 407; State ex rel. v. Olcott, 62 Ore. 286; Porter v. Paving Co.,

214 Mo. 10. (6) The court erred in sustaining the findings of fact and conclusions of law that signers of said referendum petitions in the 8th and 13th Congressional districts had a right to withdraw and did withdraw their names therefrom after same had been filed in the office of the Secretary of State and after the time had expired for filing said referendum petitions under the provisions of said Section 57 of Article 4 of the Constitution and while the temporary restraining order and temporary injunction were in full force and effect restraining defendant Sullivan from counting the names on said petitions. Chap. 59, R. S. 1909; Sec. 6750, 6751, R. S. 1909; State ex rel. v. Carter, 257 Mo. 75; Sedalia v. Montgomery, 227 Mo. 1; Norris v. Cross, 25 Okla. 287; State ex rel. Mohr v. Seattle, 59 Wash. 68; State ex rel. v. Wolf, 158 N. W. 79; State v. Gerhardt, 145 Ind. 439; Rutledge v. Marquette County, 160 Mich. 82; Koerber v. Ionia, 155 Mich. 677; Rutledge v. Marquette County, 155 Mich. 677; State ex rel. v. Gregory, 26 S. D. 13; Davis v. Cramer, 159 N. W. 887; Ogden City v. Armstrong, 168 U. S. 235; Dagley v. McIndoo, 190 Mo. App. 666. (7) The court erred in sustaining the findings of fact and conclusions of law of the master in holding that a person who had signed one of said referendum petitions in the 1st, 2nd, 8th, 9th and 15th Congessional districts could not thereafter legally administer an oath to a circulator of any other referendum petition in such district to refer said Workmen's Compensation Act, and that such referendum petitions were legally insufficient by reason thereof. Secs. 6749, 10178, R. S. 1909; State ex rel. v. Davis, 199 Mo. App. 447; Cross v. Estes, 43 Okla. 216; In re Initiative Petition No. 23, 35 Okla. 56; Thompson on Building Associations (2 Ed.), sec. 214, p. 439; Cooper v. Hamilton Assn., 97 Penn. 285, 33 L. R. A. 338.

*Alroy S. Phillips, John C. Hall, Roy D. Williams, D. S. Calfee* and *Jesse McDonald* for respondent and respondent-interveners.

(1)   The facts concerning the authority of the Prosecuting Attorney to institute this suit in the name of the State appear on the face of the petition, and by pleading over and answering to the merits after their demurrers and motions on that ground were overruled, appellants and appellant-interveners waived such objection. Sec. 1800, 1804, R. S. 1909; Kellog v. Malin, 62 Mo. 431; Richardson v. Pitts, 71 Mo. 130; Edmondson v. Phillips, 73 Mo. 60; Hudson v. Cahoon, 193 Mo. 553, 556; Hanson v. Neal, 215 Mo. 270, 277; Hubbard v. Slavens, 218 Mo. 616; State ex rel. v. Bright, 224 Mo. 523; Titus v. Development Co., 264 Mo. 239; Taber v. Wilson, 34 Mo. App. 94; Luecke v. Treadway, 45 Mo. App. 516; Billings v. Cal. Hirsch & Sons, 86 Mo. App. 231; Jones v. Railway, 89 Mo. App. 662; Duff v. Duff, 156 Mo. App. 258.   (a)  While there are authorities in which a private citizen brought, or was held to have the right to bring, such an injunction suit, the existence of such a right in a private citizen does not exclude the right of the State to maintain such action. Allen v. State, 14 Ariz. 458; Hammet v. Hughes, 104 Ark. 510, 149 S. W. 667; Barkley v. Poole, 102 Neb. 799, 169 N. W. 730; Barkley v. Poole, 173 N. W. 600. (b)  There is a difference between the remedies of mandamus and injunction as applied to public officials. Mandamus compels the performance of a public duty and may be invoked by any citizen, but injunction prevents the performance of a public duty, and that is a sovereignty which may be invoked by the State alone. Case Note, 50 L. R. A. (N. S.) 214; Case Note, L. R. A. 1917-B, 30.   (c)  An initiative or referendum petition is an order for the holding of an election and only affects rights which are political in their nature. Only the State, and not a private citizen, may invoke the equitable remedy of injunction against public officials in a matter affecting rights which are political in their nature.   And for this reason some courts have held that only the State, and not a private citizen, may sue to restrain the state officials from submitting a measure to a vote of the people. Sec. 6750, R. S. 1909; 22 Cyc.

757; State ex rel. v. Aloe, 152 Mo. 480; Friendly v. Olcott, 61 Ore. 581; State ex rel. v. Olcott, 62 Ore. 277. (d) Under and aside from Sec. 6750, R. S. 1909, the State has the right to bring suit to enjoin its officials from submitting a measure to a vote of the people. 22 Cyc. 757; State ex rel. v. Aloe, 152 Mo. 480; Friendly v. Olcott, 61 Ore. 581; State ex rel. v. Olcott, 62 Ore. 277; State ex rel. v. Hughes, 104 Mo. 459; Business Men's League v. Waddell, 143 Mo. 495; State ex rel. v. Railroad, 265 Mo. 688. (e) As jurisdiction over the action is vested in the Circuit Court of Cole County, as the Attorney-General is a proper party defendant and refuses to bring the action, as the defendant state officials reside and are served with process in Cole County and there perform the official acts toward which the suit is directed, and as the initiative or referendum petition is lodged in the office of the Secretary of State in such county, the cause of action arises in Cole County and is a matter concering the State in this county with respect to which the Prosecuting Attorney of Cole County has authority to bring an action in the name of the State. Secs. 6750, 6751, 1007, R. S. 1909; 32 Cyc. 710, 711, 715, 716; State ex rel. v. Williams, 221 Mo. 260; State ex rel. v. Lamb, 237 Mo. 437; State ex rel. v. Olcott, 62 Ore. 277. (2) This action was not prematurely brought. Sec. 6750, R. S. 1909; State ex rel. v. Carter, 257 Mo. 80. (3) The Workmen's Compensation Act is not subject to referendum. Laws 1919, pp. 484-85, sec. 81; Mo. Constitution, Art. 4, sec. 36; Mo. Constitution, Art. 4, sec. 57. Emergency measures are exempt from referendum. (a) A law which is subject to referendum cannot be made to take effect until after the time for filing a referendum petition against it has expired, which, under our Constitution, is ninety days after the adjournment of the session of the General Assembly at which it was enacted. Mo. Constitution, Art. 4, sec. 57; State ex rel. v. Carter, 257 Mo. 80; Kadderly v. Portland, 44 Ore. 118; Sears v. Multnomah County, 49 Ore. 45; Bennett Trust Co. v. Sengstacken, 58 Ore. 333; State ex rel. v. Bacon, 14 S. D. 394, 85 N. W. 605;

State ex rel. v. Whisman, 36 S. D. 260, 154 N. W. 707, L. R. A. 1917B, 1; State ex rel. v. Moore, 103 Ark. 53, 145 S. W. 199; Hanson v. Hodges, 109 Ark. 479, 160 S. W. 392; Oklahoma City v. Shields, 22 Okla. 265; People ex rel. v. Ramer, 61 Colo. 422; State ex rel. v. Meath, 84 Wash. 302; State ex rel. v. Crawford, 36 N. D. 385, 162 N. W. 710. (b) Section 57 of Article 4 of our Constitution, providing that acts subject to referendum shall not take effect for ninety days, does not amend Section 36 of the same article, authorizing the Legislature to make emergency measures take effect at once, because Section 57 makes no mention of Section 36. Mo. Constitution, art. 15, sec. 1; Russie v. Brazell, 128 Mo. 107; State ex rel. v. Roach, 230 Mo. 408. (c) Section 57 does not amend Section 36 because the latter section has hedged around the power to declare an emergency more safeguards than Section 57, the people being protected by their power to repeal the act through the initiative, or to hold their representatives responsible at the polls. Mo. Constitution, Art. 4, sec. 36; Mo. Constitution, Art. 4, sec. 57; State ex rel. v. Crawford, 36 N. D. 385, 162 N. W. 710; People ex rel. v. Ramer, 61 Colo. 422; Oklahoma City v. Shields, 22 Okla. 305. (d) In construing the Constitution effect should be given to every clause, and any interpretation which will render a clause nugatory will be discarded for one which will give it effect. Under this rule Section 57 should not be construed as amending Section 36, because exceptions are within the spirit of Section 57 and not within that of Section 36, and a contrary construction would nullify Section 36 as to all except acts not subject to referendum. Lamar W. E. & L. Co., v. City of Lamar, 128 Mo. 188; People ex rel. v. Ramer, 61 Colo. 422. Effects and consequences may be considered to ascertain the intention of law makers. State ex rel. v. County Court, 50 Mo. 317, 320; State ex rel. v. Rombauer, 104 Mo. 619; Bowers v. Smith, 111 Mo. 45; Kane v. Railway, 112 Mo. 34; Chouteau v. Railway, 122 Mo. 375; Lamar W. E. & L. Co. v. City of Lamar, 128 Mo. 188, 145 Mo. 145; Glaser v. Rothschild, 221 Mo. 180;

Barber Asphalt Pav. Co. v. Hayward, 248 Mo. 394;
Straughan v. Meyers, 268 Mo. 580. For a sovereign
state to be without the power to make a law take effect
at once is a consequence so serious as to warrant the
discarding of any construction of its constitution which
has such effect. State ex rel. v. Crawford, 36 N. D. 385,
162 N. W. 710. (e) By practical acts recognizing that
all emergency acts take effect at once, the courts of
this State, and this court in particular, as well as the
executive officers of this State and its subdivisions, have
construed Section 57 as not amending Section 36, and
such practical construction is highly persuasive on the
courts. State ex rel. v. Bacon, 14 S. D. 394, 85 N. W.
605; State ex rel. v. County Court, 50 Mo. 322; Ross v.
Railroad, 111 Mo. 25; Ewing v. Vernon County, 216 Mo.
689; Folk v. City of St. Louis, 250 Mo. 141; State ex
rel. v. Y. M. C. A., 259 Mo. 238; State ex rel. v. Roach,
269 Mo. 442; Smoot v. Bankers Life Assn., 138 Mo.
App. 466. (4) The emergency clause on the Work-
men's Compensation Act exempts the act from refer-
endum. (a) The authorities holding that the Legis-
lature must declare an act exempt from referendum do
not require such declaration to be in any particular part
of the act, and it is sufficient that such declaration be
in the emergency clause. Where, as in the case at bar,
the declaration is in the emergency clause, the suffici-
ency of such declaration to exempt the act from refer-
endum is a question of the construction of the emer-
gency clause. Kadderly v. Portland, 44 Ore. 118; Sears
v. Multnomah County, 49 Ore. 42; Bennett Trust Co.
v. Sengstacken, 58 Ore. 333; State ex rel. Tax Comm. v.
Moore, 103 Ark. 48, 145 S. W. 199; Hanson v. Hodges,
109 Ark. 479, 160 S. W. 392; State ex rel. v. Meath, 84
Wash. 302. (b) The emergency clause of the Work-
men's Compensation Law shows a plain intent to de-
clare the act "immediately necessary." Mo. Constitu-
tion, Art. 4, sec. 57; Laws 1919, pp. 484-85, sec. 81; Han-
son v. Hodges, 109 Ark. 479, 160 S. W. 396; State ex
rel. v. Howell, 85 Wash. 294. (4) The legislative dec-
laration that the Workmen's Compensation Act shall

be exempt from referendum is final and conclusive both as to law and fact, and is not subject to review by the courts. State v. Bengsch, 170 Mo. 107; Mo. Const., art. 4, secs. 57 and 36; State ex rel. Henderson v. County Court, 50 Mo. 323; State ex rel. Robbins v. County Court, 51 Mo. 83; Hall v. Bray, 51 Mo. 288; Ensworth v. Curd, 68 Mo. 285; Kadderly v. Portland, 44 Ore. 146; Bennett Trust Co. v. Sengstacken, 58 Ore. 333; State ex rel. v. Bacon, 14 S. D. 405, 85 N. W. 608; State ex rel. v. Moore, 103 Ark. 53, 145 S. W. 201; Hanson v. Hodges, 109 Ark. 486, 160 S. W. 394; Oklahoma City v. Shields, 22 Okla. 300; In re Menefee, 22 Okla. 375; In re Senate Resolution, 54 Colo. 270; Von Kleek v. Ramer, 62 Colo. 9. (5) Even the cases holding that a legislative declaration is subject to review by the courts, hold that in case of doubt the legislative declaration should be sustained. State ex rel. v. Meath, 84 Wash. 306; In re Hoffman, 155 Cal. 119; McClure v. Nye, 22 Cal. App. 248; Rigdon v. San Diego, 30 Cal. App. 107; Riley v. Carico, 27 Okla. 33; State ex rel. v. Whisman, 36 S. D. 260, 154 N. W. 712, L. R. A. 1917B, 1; Attorney-General v. Lindsay, 178 Mich. 524, 145 N. W. 98; Simpson v. Gage, 195 Mich. 581, 161 N. W. 898. (6) Whether an act is "necessary for the immediate preservation of the public peace, health or safety" is a mixed question of law and fact. In so far as it is of fact the legislative declaration should be as conclusive on the courts as is the verdict of a jury upon an appellate court where the evidence is conflicting. See authorities above. But if the fact is to be reviewed, the court should take judicial notice of the condition of industrial unrest prevailing at the time of the passage of the law, and still prevailing, of the conditions giving rise to the demand for the enactment of such a law, and of the relation which the enactment of the law bears to such conditions, all of which show the immediate necessity of the law and its relation to the public peace, health, and safety, and after resolving all doubts in favor of the legislative declaration, as in the case of a verdict upon conflicting evidence, sustain the legislative declaration. Hill v.

Union Elec. L. & P. Co., 260 Mo. 104; Hovis v. Cudahy Refining Co., 95 Kan. 512. (7) A workmen's compensation law belongs to the class of laws which may be declared exempt from referendum, for it relates to and affects the public peace, health, and safety. Laws 1919, pp. 456-485; Hill v. Union E. L. & P. Co., 260 Mo. 105; Cunningham v. Northwestern Imp. Co., 44 Mont. 180; Adams v. Iten Biscuit Co., 162 Pac. 938; New York Central R. R. Co. v. White, 243 U. S. 188; Mountain Timber Co. v. White, 243 U. S. 238; City of Milwaukee v. Miller, 154 Wis. 652, 144 N. W. 188, L. R. A. 1916A, 1; Foth v. Rope Co., 161 Wis. 552; Opinion of Justices, 209 Mass. 610; Mathison v. Minneapolis St. Ry. Co., 126 Minn. 286, 148 N. W. 71; Hunter v. Colfax Coal Co., 175 Iowa, 275, 154 N. W. 1037; Memphis Cotton Oil Co. v. Tolbert, 171 S. W. 313. (8) Only registered voters may sign an initiative or referendum petition in those places where registration is required by law. Mo. Constitution, art. 4, sec. 57; State ex rel. v. Carter, 257 Mo. 68. As used in our present Constitution the words "legal voter" mean "registered voter" in those places where registration is required by law. Ewing v. Hoblitzelle, 85 Mo. 71; Russie v. Brazell, 128 Mo. 111; State ex rel. v. White, 162 Mo. 537; State ex rel. v. Mason, 155 Mo. 506; School District v. Oellien, 209 Mo. 469; State ex inf. v. Kansas City, 233 Mo. 188; State v. Forman, 121 Mo. App. 502; State ex rel. v. Rinke, 140 Mo. App. 645; Banch v. City of Cabool, 165 Mo. App. 502. In places where registration is required by law our General Assembly intended that none but registered voters should sign initiative or referendum petitions. Sec. 6755, R. S. 1909; Laws 1913, pp. 441, 443, secs. 22, 29; Laws 1913, pp. 528-32, secs. 19, 20 and 21. The term "legal voter" points strongly to registration, for it means one who actually votes as distinguished from one who has the right to vote. Carroll County v. Smith, 111 U. S. 565, 26 L. Ed. 520; Knight v. Shelton, 134 Fed. 431; Cronly v. City of Tucson, 6 Ariz. 239; White v. Reagan, 25 Ark. 622; Bergevin v. Curtz, 127 Cal. 89; In re Denny, 156 Ind. 109; Mills v. Hallgren, 146 Iowa, 215, 124 N. W. 1077;

Nugent v. City of Newark, 77 N. J. L. 425; Fabro v. Town of Gallup, 15 N. M. 108; State ex rel. v. Blaisdell, 18 N. D. 31, 119 N. W. 363; Treat v. De Jean, 22 S. D. 512, 118 N. W. 712; Sanford v. Prentice, 28 Wis. 362; State ex rel. v. Tuttle, 53 Wis. 45, 9 N. W. 791. (9) As there are three congressional districts in the City of St. Louis, the affidavits to all of the sheets of the petition circulated in such city are insufficient. 2 C. J. 348, 350; Nebraska Moline Plow Co. v. Fuehring, 52 Neb. 541, 72 N. W. 1103. (10) A signer of a referendum petition may withdraw his name therefrom at any time before it is counted. State ex rel. v. Carter, 257 Mo. 52; City of Sedalia v. Montgomery, 227 Mo. 23; Dagley v. McIndoe, 190 Mo. App. 177. (11) One who signs an initiative or referendum petition as a petitioner is thereafter disqualified to administer the oath to a circulator. R. S. 1909, sec. 6749; State ex rel. v. Carter, 257 Mo. 78; Opinion of Justices, 114 Me. 557; Thompson v. Vaughan, 192 Mich. 512, 159 N. W. 600; State ex rel. v. Graves, 90 Ohio St. 311. A party to an instrument is disqualified by reason of his interest to administer an oath or take an acknowledgment with respect to it. 2 C. J. 329; Note 23, Am. & Eng. Ann. Cas. 1912B, 332; Note 33, L. R. A. 332; Note 23, L. R. A. (N. S.) 1075; Note 41, L. R. A. (N. S.) 375; Empire R. E. Co. v. Beechley, 137 Iowa, 7, 114 N. W. 556; Stevens v. Hampton, 46 Mo. 404; Dail v. Moore, 51 Mo. 589; Hainey v. Alberry, 73 Mo. 427; Stewart v. Emerson, 70 Mo. App. 482; Swink v. Anthony, 96 Mo. App. 420.

GRAVES, J.—Under our Rule 15 the appellant in making his brief is required, among other things, to make "a fair and concise statement of the facts of the case without reiteration, statements of law, or argument," and as to the respondent, under the same rule, it is said: "The respondent in his brief may adopt the statement of appellant; or if not satisfied therewith, he shall in a concise statement correct any errors therein."

The appellant has filed a statement of 19 printed

283 Mo.—36

pages, which covers an analysis of the pleadings, and evidence. Turning to respondents' brief, we find no corrections or criticism of this statement up to page 10 thereof, and under the rule we are at liberty to assume defendants' statement to this point to be a fair statement, and as it is as concise a statement of the pleadings as we could make we adopt it, as follows:

"This action was brought in the name of the State of Missouri, at the relation of Henry J. Westhues, Prosecuting Attorney of Cole County, Missouri, against John L. Sullivan, Secretary of State, and Frank W. McAllister, Attorney-General. The petition was filed in the Circuit Court of Cole County, Missouri, on the 8th day of August, 1919. The purpose of the action, as set out in the prayer of the petition, was to restrain and enjoin defendant Sullivan, as Secretary of State, from committing and continuing any act towards accepting and filing the petition ordering the Workmen's Compensation Act to be referred to a vote of the people or towards certifying and transmitting a copy of said act to the Attorney-General, or towards printing on the official ballot any title of said act, and to restrain and enjoin defendant Frank W. McAllister, as Attorney-General, from committing and continuing any act towards providing and returning to the Secretary of State a ballot title for said measure, and praying that in the meantime a temporary restraining order and a temporary injunction be issued restraining both defendants from committing and continuing any act towards referring said Workmen's Compensation Act to a vote of the people.

"The petition sets out the title of the Workmen's Compensation Act and alleges that on or prior to August 7, 1919, there was left with defendant Sullivan, as Secretary of State, for filing, certain documents purporting to be petitions ordering said Workmen's Compensation Act to be referred to the people of the State for their approval or rejection at the regular election to be held November 2, 1920, and purporting to be signed by five

per cent of the legal voters in each of twelve of the
Congressional Districts of the State, to wit, the First,
Second, Fifth, Sixth, Eighth, Ninth, Eleventh, Twelfth,
Thirteenth, Fourteenth, Fifteenth and Sixteenth Con-
gressional Districts; and further alleges that, notwith-
standing that on grounds thereinafter stated, objections
to the acceptance and filing of said petition have been
made to defendant prior to and at the time of offering
thereof for filing and that defendants at said times
knew that said petition was not legally sufficient, never-
theless, defendant Sullivan, as Secretary of State, was
threatening and intended to accept and file said petitions
and to certify and transmit to the defendant, Frank W.
McAllister, as Attorney-General of the State of Missouri,
a copy of said measure, and that defendant Frank W.
McAllister, as such Attorney-General, was threatening
and intended to provide and return to defendant Sul-
livan, as Secretary of State, a ballot title for said meas-
ure, nd that defendant Sullivan, as Secretary of State,
was threatening and intended to print on the official
ballot the title thus certified to him, and that, if the
said defendants were permitt d to carry out their thr a
and intentions aforesaid, great and irreparable wrong
would result to the people of the State of Missouri,
for which adequate remedy could not be afforded at law.

"The petition then states that the Workmen's Com-
pensation Act contained an emergency clause reciting
that, it being necessary for the commission therein
created to be fully organized to make preliminary prep-
arations, and, there being immediate necessity there-
for, an emergency is created within the meaning of the
Constitution, and, except as therein otherwise provided,
said act shall effect from and after the day of its ap-
proval, and that, under Section 57 of Article IV of the
Constitution of Missouri, the referendum of said act
could not be ordered in that, in fact, and by reason of,
the industrial unrest and industrial conditions and reme-
dies thereof, and, as declared by the General Assem-

bly, said law was and is necessary for the immediate preservation of the public peace, health and safety.

"The petition then states that although defendant Sullivan, as Secretary of State; Wallace Crossley, Lieutenant Governor, acting as Governor in the absence of the Governor from the State, and the persons offering the petitions for filing, were all then present in the office of said defendant Sullivan, at the time said petitions were offered for filing, said defendant did not, nor has he since, detached the sheets containing the signers' affidavits, nor has he caused them to be attached to one or more printed copies of the measure so proposed by referendum petition, nor delivered the detached copies of such measure to the person, or persons, offering same for filing.

"The petition then alleges that, as defendants well knew, said petitions were not legally sufficient for substantially the following reasons:

"1.    That said petitions were not signed by five per cent of the legal voters in each of at least two-thirds of the Congressional districts of the State, as required by law;

"2. That the persons who circulated said petition were paid ten cents or other valuable consideration for each name they procured to be signed on said peti-tion;

"3.    That, in the First, Second, Fifth, Sixth, Eighth, Ninth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth and Sixteenth districts approximately 15,200 persons signed said petitions who were not legal voters in the districts in which they signed, and that without the aforesaid signatures said petitions in each of said districts would not contain five per cent of the legal voters thereof;

"4.    That approximately 15,200 fictitious names were placed on the petitions circulated in the above named Congressional districts and that, without said fictitious names, said petitions in each of said districts

would not contain five per cent of the legal voters thereof;

"5. That the petitions purporting to be circulated in each of said Congressional districts are in many places signed more than once by the same alleged voters;

"6. That in many respects, said petitions failed to conform to the requirements of the law;

"7. That approximately 15,200 signatures appear on the petitions circulated in the above named districts which were not signed by the persons whose names they purport to be, nor by their authority, and that, without signatures, said petitions are insufficient.

"8. That the persons who circulated said petitions and various other persons represented to the people of the State of Missouri and to all signers of said petition that said petitions were for a protest against ten-cent street car fares, low wages, or were to refer the liquor search-and-seizure act, or the resolution attacking national prohibition, or that no Workmen's Compensation Act had been passed, or that almost all of the workers of the State were dissatisfied with said Compensation Act and desired it submitted to a referendum of the people, and made various other false and fraudulent representations, by reason of which all of said petitions are null and void.

"9. That, by reason of said false representation, approximately 13,250 signers of said petitions have withdrawn their names therefrom, and that without the names of said legal voters who have so withdrawn said petitions did not contain five per cent of the legal voters in two-thirds of the Congressional districts of the State; that approximately 15,500 voters who signed said petition in the aforesaid Congressional districts desired and intended to withdraw their names from said petition and that, without the names of said voters who so desire and intend to withdraw, said petitions do not contain signatures of five per cent of the legal voters in each of two-thirds of the Congressional districts of the State.

"On the day of filing of the petition, the Circuit Court of Cole County, granted a temporary restraining order, against the defendants, and thereafter, on the 11th day of September, 1919, said circuit court granted a temporary injunction in said cause and gave defendants leave to plead to the petition on or before the 18th day of September, 1919.

"On the 11th day of September, aforesaid, Maurice J. Cassidy et al., petitioned the court for leave to intervene as parties defendant in said cause, which leave was by the court granted.

"Thereafter, on the 25th day of September, 1919, John C. Hall and R. T. Wood, petitioned the court for leave to intervene as parties plaintiff in said cause, which leave was by the court granted.

"Various demurrers and motions, challenging the sufficiency of the relator's petition and his jurisdiction and authority to institute this suit, were filed by defendants and intervening defendants, all of which were by the court overruled.

"On the 25th day of September, 1919, defendants and intervening defendants filed their separate answers alleging in substance that:

"1. On or prior to August 7, 1919, there was filed with the defendant John L. Sullivan, as Secretary of State, a referendum petition, in form as required by law, ordering that said Workmen's Compensation Act be referred to the people of the State of Missouri for their approval or rejection at the general election to be held November 2, 1920.

"2. That said petition was signed by more than five per cent of the legal voters in each of at least two-thirds of the Congressional districts of the State;

"3. That it became the duty of John L. Sullivan, as Secretary of State, to file said petition and certify and transmit to the Attorney-General a copy of the said referendum petition.

"4. That it then became the duty of said Attorney-General to prepare an official ballot title for said measure

and return same to the Secretary of State within ten days thereafter;

"5. That, under the provisions of Section 57 of Article IV of the Constitution of Missouri, all laws passed by the General Assembly of the State are subject to the referendum provisions of the aforesaid section, except laws necessary for the immediate preservation of the public peace, health and safety, or laws making appropriations for current expenses of the state government or for the maintenance of state institutions or for the support of public schools, which must be set forth in said measure and so determined by the General Assembly enacting same;

"6. That said Workmen's Compensation Act does not come within the exception of said constitutional provision, nor has the General Assembly so determined in any provision of said act;

"7. That Section 81 of the Workmen's Compensation Act purporting to contain an emergency clause is unconstitutional, null and void, and in violation of the provisions of Section 57 of Article IV of the Constitution aforesaid;

"8. That the State of Missouri is not a party in interest in this suit, pecuniarily or otherwise, and consequently is improperly made a party plaintiff herein;

"9. That relator, Henry J. Westhues, as the Prosecuting Attorney of Cole County, has no authority at law to bring this suit in the name and on behalf of the State of Missouri;

"10. That there is a misjoinder of parties defendant, in that Frank W. McAllister as Attorney-General is improperly made party defendant; and

"11. That the suit is prematurely brought.

"And for further answer denying generally each and every other allegation in: the plaintiff's petition contained.

"To this answer, relator on the 25th day of September, 1919, replied by filing a general denial of each and every allegation in said answer contained, and on the

same day, over the objections and exceptions of the defendants and intervening defendants, the court appointed A. T. Dumm as special master in chancery to hear and determine all the issues of law and fact and to report same to said court by November 1, 1919, and strictly to observe the law as to exceptions and objections.

"On the same day, intervening plaintiffs, Wood and Hall, voluntarily filed a bond for costs in the sum of $7,500, and on joint motion of the relator and intervening plaintiffs, Wood and Hall, the intervening defendants were required to give bond in like sum.

"The time for filing of the special master's report was duly extended from time to time until the 24th day of January, 1920, during the November term of the Cole County Circuit Court, at which time said master in chancery filed his report, including his findings of fact and conclusions of law, in which he found all the issues in favor of the relator and against the defendant, and to which findings defendants and intervening defendants on the 28th day of January, 1920, duly filed their exceptions.

"On the 30th day of January, 1920, during the November term of said Cole County Circuit Court, said report of the special master in chancery and the exceptions of defendants and intervening defendants thereto were taken up by the court, and said exceptions were overruled and judgment entered against defendants in accordance with the findings of the special master herein.

"In due time defendants and intervening defendants filed their joint motion for a new trial, which motion was by the court overruled.

"On the same day, said defendants and intervening defendants filed their affidavit for appeal, which appeal was granted to this court.

"By stipulation between counsel for relator and counsel for defendants, entered into and filed before the appointment of the special master in chancery, it was provided that affidavits might be introduced in evidence in lieu of oral testimony.

"Under the rulings of the master, both the oral and documentary evidence offered by the relator was permitted to take a wide range."

In the foregoing we have taken no disputed portion of the statement. This gives a fair outline of the issues. The questions raised thereon and raised by the evidence and rulings can best be taken up in the several paragraphs of the opinion, and in such paragraphs the further pertinent facts can be stated.

I. The first contention is that Henry J. Westhues, as Prosecuting Attorney of Cole County, was not authorized to bring this suit, in the name of the State. That there are certain suits which the prosecuting attorneys of the counties can bring in the name of the Power to Sue. State is made apparent by our more recent holdings. [State ex. rel. v. Lamb, 237 Mo. 1. c. 450 and 454; State ex rel. v. Williams, 221 Mo. 1. c. 261.]

The whole matter is thoroughly discussed by FERRISS, J., in the Lamb case, supra. The rule is, that such prosecuting officer can not proceed in the name of the State, save and except the matters involved are matters arising within and pertaining to the jurisdiction of such prosecuting officer. In other words, they must be matters which concern the State in the limited territory over which such officer has control, or in which he has power to act. His limit is the county for which he was elected. Westhues as Prosecuting Attorney of Cole County can use the name of the State in such matters in which the State is interested within the confines of the said County of Cole. The real question is whether or not the things pleaded are matters localized to Cole County, or whether the State's interest in the proceeding is one of broad expanse, and covering a matter having a state *situs* rather than a county *situs*. If the latter, the State must proceed through the Attorney-General; if the former, it may proceed through the local prosecuting officer. Upon this point nothing can be added to the learning of the two recent cases cited, supra. In addition the

statutes fix their respective lines of action. That of the Attorney-General is state-wide, whilst that of the prosecuting attorney is local. Whether the one or the other can act must be determined from the nature of the subject-matter of the action. This is made clear in both of the cases cited, supra. The question then is, what is the subject-matter involved in this action? The real purpose of the bill is to prevent the reference of a state law. In fact the chief contention is that the law is not one subject to reference under our Constitution. It is true there are other charges, but the purpose and gist of the action is to stop the voters of the State, through a referendum, from voting for or against this particular legislative act. It is further true that it seeks to gain this end by stopping Sullivan and McAllister from performing certain official acts, which acts would be performed at the seat of state government (in Cole County), but we don't think this so localizes the real subject-matter of this action, as to authorize the prosecuting attorney to act in the name of the State in this action. We think the case of State ex. rel. v. Williams, supra, fully settles this case, and settles it adversely to the claim of Westhues in this case.

II. But whilst it is clear that Westhues was not a proper relator in this case, as above ruled, difficulties arise as we move forward. A little of the history of the case should here appear. The original petition was by Westhues alone as relator. Later Maurice J. Cassidy et al. made application to intervene on the side of defendants. They were permitted to do so. Later John C. Hall and R. T. Wood petitioned the court to intervene as parties plaintiff, and they were allowed so to do. When Cassidy et al. were permitted to come in as defendants they adopted the demurrer and motion to dissolve filed by the original defendants. Motion to strike out parts of petition was also filed. All were overruled. They likewise demurred to the petition of Hall and Wood to be made parties plaintiff, but this

*Waiver.*

was overruled. Then we have an amended petition filed, wherein Westhues as relator, and Hall and Wood as interveners and citizens, join in the several charges of the petition. To this the original defendants and the intervening defendants filed a joint demurrer, and this being overruled, the said defendants and intervening defendants answered over, preserving in their answer several of the matters urged in their demurrers. Following these was the reply.

It is urged that by answering over, the matters in the demurrer were waived, and have no vitality here. At this point several questions arise. Defendants not only contend that Westhues was not a proper relator, but they further contend that the State itself could not bring the suit. In paragraph one, supra, we agree that Westhues was not the proper relator, even if the State upon the relation of its proper officer could bring the suit. The contention of the defendants on the question is that the law contemplates that the citizen and taxpayer is the party to bring the suit. But as we view the matter but little need to be said upon this point. By leave of court both Hall and Wood were, as citizens and taxpayers, admitted as parties plaintiff, along with the relator Westhues, for the State. To this amended petition defendants demurred, but did not stand upon this demurrer after it was overruled. They answered over, and in our judgment waived the whole matter. Under Section 1800, Revised Statutes 1909, the defendants were compelled to demur to all things that appeared upon the face of the petition. By Section 1804, Revised Statutes 1909, the defendants were allowed to raise by answer such matters as did not appear upon the face of the petition, but this Section 1804, further proceeds and says:

"If no such objection be taken, either by demurrer or answer, the defendant shall be deemed to have waived the same, excepting only the objection to the jurisdiction of the court over the subject-matter of the action, and excepting the objection that the petition does not state

facts sufficient to constitute a cause of action.''

When the citizens joined with the State and its relator in the amended petition, it might be conceded for the sake of this argument (1) that the State itself was an improper party plaintiff, (2) that Westhues was an improper relator, yet these were matters apparent upon the face of the petition, and should have been saved by standing upon their demurrer. Answering over waived the question. In Hanson v. Neal, 215 Mo. l. c. 277, it is well said:

"Of error assigned in the overruling of the demurrer, this may be said: No exception was saved to that ruling, but none was necessary. [Thorp v. Miller, 137 Mo. l. c. 239.] However, it is trite doctrine that a defendant waives his demurrer by answering over (Pickering v. Tel. Co., 47 Mo. 460), at least, as to every ground except a question of jurisdiction, or except the 6th specification in the statute, Revised Statutes 1899, section 598. [Jones v. Railroad, 178 Mo. 528; Hudson v. Cahoon, 193 Mo. 547.]"

So that the misjoinder of plaintiffs in the amended petition, and the failure of the State to have an interest in the suit as a plaintiff, and the misjoinder of the defendants, McAllister and Sullivan, were questions arising upon the face of the petition, and were waived by answering over.

Of course the petition and the evidence must show that at least some of the plaintiffs had a right of action. [Gruender v. Frank, 267 Mo. l. c. 719.] But the defendants concede that citizens and taxpayers could, at the proper time, maintain this suit. There were citizens and taxpayers as plaintiffs in this case.

Whether or not the suit was prematurely brought we take next.

III. A further contention is made that the suit was prematurely brought. We are inclined to think that there is substance in this contention. We say this under the express terms of the petition in this case.

The action is one to enjoin the Secretary of State from filing the petitions for referendum, and he **Premature Suit.** was enjoined, and now stands enjoined. The petition avers that he is threatening to file such petition. There is no allegation that he has filed them. Until he has filed them, the Attorney-General has no action to take at all. [R. S. 1909, sec. 6751.] The Attorney-General only prepares a ballot title after the filing of the measure to be referred, and the filing of the petitions for reference, by the Secretary of State. Until there has been a filing, the Attorney-General has nothing whatever to do with the matter. The petition before us disclaims a filing, and seeks to prevent such action by the Secretary of State. And up to this good hour the Secretary of State, in the language of the final judgment, stands "permanently restrained and enjoined from committing or continuing *any act toward accepting or filing* the petition ordering the Workmen's Compensation Act to be referred to a vote of the people." It is therefore clear that the action was premature as to the Attorney-General. The time for even threatened action upon his part had not arrived. Nor would this time arrive until after there had been a filing made by the Secretary of State. As to McAllister the judgment must be reversed.

But how stands the question of premature action as against the Secretary of State? To our mind this is determined by our statute, Section 6750, Revised Statutes 1909. This section provides for two remedies, i. e. (1) mandamus against the Secretary of State, in an action by a citizen, if such Secretary refuses to accept and file a legally sufficient petition, and (2) an injunction against such Secretary if he accept and file a legally insufficient petition. In the latter action "the court may enjoin the Secretary and all other officers from certifying or printing on the official ballot . . . the ballot title and number of such measure."

It should be noted, however, that this right to enjoin, or proceed by injunction, does not arise until the

alleged petitions have been accepted and filed by the Secretary of State. In other words this statute contemplates that the state official shall first act. If he refuses to file, then the citizen can mandamus him. If he accepts and files an insufficient petition, then he may be enjoined from placing the ballot title on the ballot for the next ensuing election. But both rights of action follow the action of the Secretary of State, and neither precedes his action. The right to mandamus couldn't arise until the officer refused, and the purpose of the statute is to make the right to enjoin follow the official action of filing, and not to precede such official action. We think this is the construction placed upon this statute by this court in State ex rel. v. Carter, 257 Mo. l. c. 78, whereat it was said:

"From this it is reasonably plain that our statute means what it says, and that 'when any such referendum petition' (i. e. a referendum petition signed by five per cent of the voters in at least two-thirds of the Congressional districts, and who purport from the verifications aforesaid [Section 6749] to be legal voters of the State and of such congressional districts) 'shall be offered for filing,' the Secretary of State shall file the same; he has no discretion in the matter; if he refuses to file such petition he may compelled by mandamus to do so. [Section 6750.] In such mandamus suit the legality of the signers in all respects, the number of the signers, their residences, the genuineness of their signatures and other conditions precedent for legality may be fully threshed out as cold questions of law, upon the proof made on the trial as in any other mandamus suit. If on the other hand the Secretary of State files a referendum petition which is insufficient by reason of a lack of legal signers, or for lack of enough Congressional districts represented, or by reason of forgery or other fraud, he may be enjoined from further action and thereupon the whole matter of insufficiency from the lack of any requirement of statute or of Constitution, may be judicially examined, determined and adjudged."

State ex rel. Westhues v. Sullivan.

This statute does not rob the courts of their power to use the equitable remedy of injunction, but it is a reasonable limitation on the use of that remedy by the courts. The purpose of fixing the point at which the courts can intervene by injunction is to give the state officer the right to first act, and should he act wrongfully, by reason of facts, some of which might not be known to him, the courts can then intervene by injunction, to the end that the very rights of the matter may be found. So we rule that this suit was not only prematurely brought as against the Attorney-General, but likewise as to the Secretary of State. The purpose of the statute is to correct the action of the official, and not to prejudge or prevent official action.

IV. While we are satisfied that the present suit was prematurely brought, and for that reason the judgment must be reversed, yet a new suit might be brought which would involve the questions upon the merits, now urged in this suit, and for that reason we deem it proper to dispose of those questions. The first question is, that this law is not referable under our Constitution.

Immediate Effect: Emergency Clause.
The trial court so ruled, and it is an important matter. Important not only in this case, but it should be ruled for the future. The contention that the measure can not be referred to the voters is bottomed upon the following emergency clause of the act:

"Sec. 81. *Emergency*. It being necessary for the commission herein created to be fully organized and make preliminary preparations, and there being an immediate necessity therefor, creates an emergency within the meaning of the Constitution, and except as in this act otherwise provided, this act shall take effect from and after the date of its approval."

The broad position is taken that no law passed with an emergency clause is the subject of referendum under our Constitution. In other words the Legislature can foreclose the constitutional right of referendum by simply tacking on and passing an emergency clause.

This idea is not sound, nor does it comport with the weight of the better reasoned cases.

The question involves the consideration of several parts of our Constitution, and among others Section 57 of Article IV. The applicable portion of said Section 57, reads:

"The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety and laws making appropriations for the current expenses of the State government, for the maintenance of the state institutions and for the support of public schools) either by the petitions signed by five per cent of the legal voters in each of at least two-thirds of the Congressional districts in the State, or by the Legislative Assembly, as other bills are enacted."

A further sentence of said Section 57, of prime importance says:

"But the people reserve to themselves power to propose laws and amendments to the Constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls *any act* of the legislative assembly."

Note the comprehensive term "any act" as used above. Section 36 of Article IV (also involved herein) reads:

"No law passed by the General Assembly, except. the general appropriation act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless in case of an emergency (which emergency must be expressed in the preamble or in the body of the act) the General Assembly shall, by a vote of two-thirds of all the members elected to each house, otherwise direct; said vote to be taken by yeas and nays and entered upon the journal."

There is no express declaration in the emergency clause to this act, bringing it within the exceptions

contained in Section 57 of Article IV of the Constitution. The only laws excepted from the referendum under this constitutional provision are "those necessary for the immediate preservation of the public peace, health or safety, and laws making appropriations for the current expenses of the state government, for the maintenance of the state institutions and for the support of public schools." The emergency clause to this act does not claim the act to be one of the class mentioned in this exception. Under Section 57, Article IV, all measures not falling within this excepted class are subject to the referendum.

The emergency clause to the measure under consideration does not attempt to declare such measure to be of the excepted class in the constitutional provision named. It only declares in a way, the legislative reason for the conceived emergency. It does not declare that the measure is "necessary for the immediate preservation of the public peace, health or safety." If it had so declared the declaration would have been false on the face of the measure itself. But for our present purpose it suffices to say that the emergency clause does not bring the measure within the excepted class named in the Constitution. So that unless a mere emergency clause will exempt the measure from referendum, the contentions of plaintiffs and relator must fail. They urge that under Section 36 of Article IV, the Legislature has the power, by expressing an emergency in the face of the bill, and passing the emergency clause by a two-thirds vote, to put any law into immediate effect.

We do not so view the matter. The force and effect of Section 57, when read with Section 36 of said Article IV, is to withdraw from the power of the Legislature to put into immediate effect any measure subject to the referendum. The two sections must be read together and made to harmonize in the light of the history of the constitutional provisions. Section 57 contemplates that "any act" of the Legislature is subject to the referendum, save and except the measures therein specifically named.

The term "any act" covers measures which were theretofore subject to the emergency clause, spoken of in Section 36, so that it should be ruled that measures not excepted by Section 57, are not subject to an emergency clause, but only become effective at the end of ninety days, when the time for referendum has expired. In no other way can these two sections be made to harmonize. [Sears v. Multnomah County, 49 Ore. 1. c. 44.]

In this case the court discusses the Oregon referendum constitutional provision, and the Oregon constitutional provision as to emergency clauses. As said by Faris, J., in State ex rel. v. Carter, 257 Mo. 1. c. 70 et seq., we borrowed our referendum provision from Oregon, and borrowed it after the ruling in the Sears' case, supra. That ruling then becomes very material, and from that case we quote the following:

"There is practically but one question involved here. That is whether the emergency clause in the amendment of Section 2926, B. & C. Comp., approved December 24, 1903 (Sp. Laws 1903, p. 14), is such as to render the law effective from that date. The emergency clause of that act reads as follows, viz: 'Whereas, the compensation of judges in judicial districts composed of one county only, is, under the present law, inadequate, an emergency is declared, and this act shall take effect upon its approval by the Governor.' This emergency clause in the amendment of Section 2926 was evidently intended as a compliance with the requirements of Section 28 of Article IV of the Constitution, and is sufficient under that section if it is not affected by the amendment of Section 1 of that article, adopted June 2, 1902, which provides, among other things: 'The people reserve to themselves . . . power at their own option to approve or reject at the polls any act of the legislative assembly . . . The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety), either by petition, etc. Referendum petitions shall be filed with the Secretary of State not more than

ninety days after the final adjournment of the session of the legislative assembly.'

"This court, in Kadderly v. Portland, 44 Ore. 118, 147, 74 Pac. 720, in speaking of the exception made in the amendment of Section 1 of Article IV of the Constitution, namely, laws 'necessary for the immediate preservation of the public peace, health or safety,' say that the Legislature might put them in operation through an emergency clause as provided by Section 28 of Article IV of the Constitution or allow them to become laws without an emergency clause, the necessity or expediency of either course being matter for its exclusive determination, but, 'as to all other laws the amendment applies, and they cannot be made to go into operation for ninety days after the adjournment of the session at which they were adopted, or until after approval by the people, if the referendum is invoked.'

"Counsel for respondent claims that the decision of this point was not an essential one in the Kadderly Case, questions its correctness, and seeks to have it re-examined by the court at this time.

"It is claimed by the appellant that the emergency clause that will authorize an act to take effect upon its approval must be such an emergency as comes within the exception contained in the amendment of said Section 1 above quoted. Respondent claims that this amendment of Section 1 does not effect Section 28 of Article IV, and that the Legislature may still give immediate effect to any act, by the terms of Section 28, to which it applied previous to the amendment of Section 1. We think that to put such a construction upon the amendment of Section 1 would violate its true purpose and intent. Respondent relies upon State v. Bacon, 14 S. D. 403, 85 N. W. 605, which, in passing upon a similar constitutional provision, holds, in effect, that the amendment of Section 1 of Article IV should have read into it Section 28 of that article, viz., that the exception in that amendment of 1902 of Section 1 of Article IV should be interpreted as though it read: 'Except as to laws

necessary for the immediate preservation of the public peace, health or safety, and except also such laws as are passed with an emergency clause as provided in Section 28.' We cannot give our consent to this construction of the amendment, but rather hold that the exception in the amendment should be read into Section 28 of Article IV. Otherwise the reservation in the amendment that 'the people reserve power at their own option to approve or reject at the polls any act of the legislative assembly' would be rendered futile. Thus, instead of leaning 'in favor of that construction which will render every word operative,' as suggested in the case of State v. Bacon, the effect would be to make the amendment idle and nugatory. We believe the amendment makes its own exceptions, and, if those conflict with Section 28 of Article IV, they will constitute a limitation upon it to that extent.

"That an act may take effect under a general emergency clause, and yet be subject to the referendum, is clearly contrary to the intent of the amendment, and would produce disastrous results. The clause in the amendment which reads, 'Any measure referred to the people shall take effect and become the law when it is approved by a majority of the votes cast thereon, and not otherwise,' clearly means that a law upon which the referendum is invoked cannot take effect prior to its approval by the vote; and consequently no act that is subject to the referendum can be made to go into operation for ninety days after the adjournment of the session or its approval by vote.

"Therefore we conclude that if the act comes within the amendment of Section 1 of Article IV of the Constitution, and the Legislature desires to have it take effect upon its approval, it must so declare, and set it forth in the preamble or body of the act, and, as the emergency clause contained in this act does not pretend to bring it within the exception of the amendment of Section 1 of Article IV, it cannot operate to give it immediate effect, and therefore it became effective ninety

days from the approval thereof by the Governor, and the demurrer to the complaint should have been sustained."

The language, supra, "We believe the amendment [in Missouri, Section 57] makes its own exceptions, and, if those conflict with Section 28 of Article IV [in Missouri Section 36 of Article IV] they will constitute a limitation upon it to that extent," is sufficient, and satisfying. No other construction can be given which will give force and effect to both sections. This Oregon case met with our express approval in State ex. rel. v. Carter, 257 Mo. l. c. 70 et seq., supra.

The force of the rule is that the Legislature cannot give immediate effect to any measure which is subject to referendum, but may or may not (by an emergency clause) give immediate effect to non-referable laws. When read together these constitutional provisions mean that by no process can the Legislature preclude the referendum upon measures subject to reference by the terms of Section 57, supra. That the term "any act" as therein used is broad enough to cover the measure before us can not be questioned. To like effect in Arkansas Tax Commission v. Moore, 103 Ark. l. c. 53, whereat it is said:

"Under this initiative and referendum amendment only 'laws necessary for the immediate preservation of the public peace, health or safety' are excepted from its provisions, and no power is reserved by the people to pass directly upon such laws. *All other laws* are subject to its operation, and ninety days being given by its terms from the final adjournment of the session of the Legislature which passed them in which to demand or order the referendum thereon, they cannot take effect or go into operation till the expiration of ninety days after such adjournment nor thereafter until approved by the people, if the referendum is ordered or invoked. It was not intended that an act passed by the Legislature should take effect conditionally and subject to the referendum, and continue in force from its passage if

the referendum was not ordered, or that an act once in force should be suspended by the referendum till its approval by the people. That such purports to be a law of the State is a law or it is not a law, according as the proof of the fact may be, and not according to the shifting circumstances of the parties. It would be an intolerable state of affairs if a document purporting to be an act of the Legislature could thus be a law in one case and for one party, and not a law in another case and for another party; a law to-day and not a law to-morrow; a law in one place and not a law in another in the same State. And whether it be a law or not a law is a judicial question to be settled and determined by the courts and judges. [South Ottawa v. Perkins, 94 U. S. 260; Wilkes County v. Coler, 180 U. S. 506; Rogers v. State, 72 Ark. 565.]''

At page 56 of the same opinion, it is further said:

''In Sears v. Multnomah County, 88 Pac. 522, the court construed a like provision of the Constitution of Oregon in connection with a former one providing that laws should become immediately effective upon an emergency declared therein by the Legislature, and held that a law in which an emergency was sufficiently declared to become effective under the old provision of the Constitution would not become effective after the adoption of the amendment containing a like exception as our own, and that the exception in the amendment should be read into the former provision of the Constitution, saying: 'We believe the amendment makes its own exceptions. If this conflict with Section 28 of Article IV, that will constitute a limitation upon it to that extent Therefore we conclude that if an act comes within the amendment of Section 1, Article IV, of the Constitution, and the Legislature desires to have it take effect upon its approval, it must so declare and set it forth in the preamble or body of the act; and as the emergency clause contained in this act does not pretend to bring it within the exception of the amendment to Section 1 of Article IV, it cannot operate to give it im-

mediate effect, and therefore it became effective ninety days from the approval thereof by he Governor.'

"The provisions of the amendment must be liberally construed to effectuate the purpose of the sovereign people, who by its terms expressly reserved the right to order the referendum upon all laws passed by the Legislature, except such as the Legislature itself should determine and in so doing declare were necessary for the immediate preservation of the public peace, health or safety.

"The concluding provision of the revenue act and the others fixing dates for the performance of certain things before the act could become operative under the constitutional amendment unless it comes within the exception, do not manifest an intention upon the part of the Legislature to put it into effect as a law necessary for the immediate preservation of the public peace, health or safety, and were not meant for, and are not, a legislative determination that the act should take effect as such, and it could not therefore take effect until ninety days after the final adjournment of the session of the Legislature at which it was passed or after its approval by the people if the referendum is invoked. Consequently, it was not the law when this suit was brought, nor authority for this procedure by the Tax Commission, and the judgment of the lower court dismissing the complaint was right, and it is affirmed."

This case from Arkansas we likewise approved in State ex rel. v. Carter, 257 Mo. l. c. 72. Along the same line, see also the following: In re Interrogatories By The Governor, 181 Pac. (Colo.) 197; Kadderly v. Portland, 44 Ore. l. c. 147; State ex. rel. v. Whisman, 36 S. D. l. c. 274; State ex rel. v. Meath, 84 Wash. l. c. 311; Bennett Trust Co. v. Sengstacken, 58 Ore. l. c. 342. See also the sundry cases cited in the above cases, as well as further citations in defendants' brief.

In the Colorado case, first above cited, the court in answering the Governor's queries, has so concisely

stated our views, that from page 200 of 181 Pac. Reporter we borrow from that opinion this language:

"The conclusion is irresistible that no act, not of the excepted class, can have the force of law, or can become operative until after ninety days from the adjournment of the Assembly at which passed, and if referred, then not until approved by a majority of the people by vote at a general election. It is argued that the emergency clause of the Constitution above recited was not repealed, by the initiative and referendum amendment. This requires no argument. It was not so repealed. It is as effective now, as it was before the amendment in so far as the Legislature has power to finally enact statutes. When the General Assembly had the absolute power to enact all legislation, the emergency provision was applicable to all acts of the body. But when the power to finally enact legislation was withdrawn from the General Assembly except as to certain classes, then manifestly the emergency provision could apply only to acts within the power of the Legislature to finally enact. Plainly the Legislature cannot act in an emergency where it has no power to act at all. It can only apply the emergency clause of the Constitution to an act to which it has the power to give finality."

In this Colorado case, many of the cases are collated and discussed. So that we rule that the emergency clause to this measure does not save the measure from referendum. The measure, not being of the excepted class specified in Section 57, Article IV, of the Constitution, could not be put into immediate effect. That no measure subject to referendum by the terms of the Constitution can be put into immediate effect.

V. The next contention is that although we may rule that the usual emergency clause of a measure may not prevent its reference, as we have ruled above, yet it is contended that the expressions in Section 81 of the measure before us are such as to amount to a legislative declaration that the measure is one "necessary for the im-

Legislative
Determination
of Necessity.

mediate preservation of the public peace, health or safe-
ty;'' and that the courts cannot go back of such legis-
lative declaration.

In the first place the language in said Section 81
of the Act of 1919 (Laws of 1919, p. 484) is not such a
legislative declaration, and with this the matter might
end. In a valuable note in 36 Cyc. 1194, it is well said:

"Under a constitutional provision for the submis-
sion of acts to the people before their taking effect 'ex-
cept as to laws necessary for the immediate preserva-
tion of the public peace, health or safety,' a clause in-
tended to put them in effect before the time prescribed
by the general law must not only declare an emergency,
but must also set forth such an emergency as is de-
scribed in the above quoted provision of the constitu-
tion.''

This emergency clause touches neither side nor bot-
tom when measured by this rule.

But both sides urge and discuss the larger question,
as to whether or not such legislative declaration would
foreclose the matter in the courts. Upon this question
the courts are divided, and in our judgment some have
been led into error by reason of court rulings upon
mere emergency declarations. Before the days of initia-
tions and referendums all the state constitutions contain-
ed sections similar to Section 36 of Article IV of the
Missouri Constitution. The courts were liberal in con-
struing the emergency provision of such sections. They
largely ruled that when the law-making body said that an
emergency existed, the matter was foreclosed. It was
simply a matter of the time at which the law became
effective, and had no real substance. And since the
referendum provisions of state constitutions, some courts
viewing the "peace-and-safety" clause of these consti-
tutional provisions in the light of mere emergency clauses
of a law, have ruled that if the law-making body declared
that the measure was for the "immediate preservation of
the peace, health or safety," such legislative declara-
tion was binding upon the courts, and a finality. To

the rule in this line of cases we do not agree. The very substance of a constitutional right could be taken from the people by an over-anxious and hostile legislative body. The right here involved is not only constitutional, but one of vital importance and of large proportions. If the courts cannot view the whole measure and from it determine whether or no the law-makers over-stepped the constitutional restrictions, in denying the referendum of the measure by their ukase on the subject of "immediate preservation of peace, health or safety," then the constitutional referendums become a farce. It becomes a legislative referendum, rather than a constitutional referendum, because by a mere false declaration as to "the peace, health or safety" every measure could be precluded from the constitutional referendum.

To our mind the sensible rule is well expressed in State ex. rel. v Meath, 84 Wash. l. c. 312 et seq., whereat, after stating the ruling in an Oregon case, it is said:

"We hesitate to match opinion with one so learned in the law as the writer of this opinion, but conscience impels a different conclusion. His argument is fallacious and unsound. Under the old form, the Legislature was acting under a free license to legislate. The people had reserved no right of review. Its act implied discretion, and courts had very properly held that one coordinate branch of the government will not review the discretion of another. There was no review or appeal from an expression of that discretion, however violently it wrenched the moorings of constitutional restraint. The declaration of an emergency was final and conclusive. But here no such declaration is final, and should be given no immediate effect unless it can be fairly said that the act is necessary to preserve the health, peace or safety of the State or to support the government or its institutions. 'The courts are not bound by mere forms nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look to the substance of things, whenever they enter upon the inquiry whether the Legisla-

ture has transcended the limits of its authority. If, therefore, a statute purporting to have been adopted to promote the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.' [Mugler v. Kansas, 123 U. S. 623, 661.] The reservation in the amendment is a declaration of 'thou shalt not,' except it be for the safety or support of the State. Broadly stated, the police power of the State is the State's law of self-defense, in respect to both persons and property. [Carstens v. DeSellem, 82 Wash. 643, 144 Pac. 934.]

"The learned justice who wrote the opinion in the Kadderly case is in error when he says the obvious answer to the question, 'What remedy will the people have if the Legislature, either intentionally or through mistake, declares falsely or erroneously that a given law is necessary for the purpose stated?' is 'that the power has been vested in that body, and its decision can no more be questioned or reviewed than the decision of the highest court in a case over which it has jurisdiction.' [Kadderly v. Portland, supra, p. 150.]

"On the contrary, power has been withheld, in so far as a withholding can be made by apt and certain words. It follows, then that it is a question of power rather than of discretion. The limitation of that power must be found in the terms of the Constitution, construed in connection with the intent of the people in incorporating such a provision in the Constitution. [Attorney General ex rel. Barbour v. Lindsay, 178 Mich. 524, 145 Pac. 98.]

"We think it will not be denied that a case might be postulated where the courts would say that the discretion of the Legislature has been abused. [Riley v. Carico, 27 Okla. 33.]

"If this be so, the case at bar is such a case. Suppose, for instance, that the Legislature had amended

the law so as to reduce the legal rate of interest; legal-
ize a bond issue once declared to be invalid; or create
a legal holiday, and declare an emergency, would any
one say that the act should take effect immediately be-
cause the health, peace, or safety of the State demand-
ed it? Surely no one would have the hardihood to argue
that it was not a deliberate withholding of the right of
referendum. Our thought is evidenced in the case of
Oklahoma City v. Shields, 22 Okla. 265, 305, 100 Pac.
559. In that case the court said, after some discussion
and quotation from the Kadderly case: 'We conclude
that the judgment of the Legislature in determining
whether or not an emergency existed—that is, whether
or not a measure is immediately necessary for the pres-
ervation of the public peace, health, or safety—rests
solely with the Legislature. It is not subject to re-
view by the courts, or any other authority except the
people. Under the reserved power of the initiative
and referendum, after the declaration of an emergency
when not referred to the people for their judgment in
such measure it still remains with the people, if they are
dissatisfied with a measure, by an initiative petition to
cause the same to be submitted to the people at the next
general election for determination as to whether or not
such act shall be repealed.' The judges evidently did
not consider their words. 'It [the declaration of an emer-
gency] is not subject to review by the courts, or any
other authority except the people.' They recognized
that it is subject to review by the people, but they say
that it shall not be reviewed in the way the people have
said they will review it if they so desire. It is no an-
swer to the proposition to say that the people have a
remedy under the reserved power of initiative; that if
they are dissatisfied with the act of the Legislature
they may initiate a bill to repeal the measure at the
next general election. If the people had been content
to adopt that plan alone, they would not have reserved
the right of the referendum at all. When, therefore, the
question comes whether the Legislature has a right to

declare an emergency which will take away the right of referendum, the doubt, if there be any, should be resolved in favor of the reserved power of the people instead of in the admittedly unwarranted declaration by the Legislature. And in so declaring, the courts do not assume to say that the Legislature has abused its discretion. They go no further than to say that the Legislature cannot, by any act which is not clearly within its granted power, cut off the right of the people to say for themselves, at an election to be held for that purpose, whether its discretion has been abused, or no.''

And in State ex rel. v. Whisman, 36 S. D. 1. c. 275, it is said:

''In State v. Meath the court held that, as, under the Constitution of 1889, the courts had decided they were without authority to review the legislative discretion in declaring an emergency, they should, after the adoption of the initiative and referendum amendment, scrutinize a legislative declaration of an emergency and declare the declaration void in case it is obviously false; for the spirit of a law and the mischief intended to be remedied must be considered.''

The reason of the thing lies with this rule. By the referendum provision of our Constitution, as we have construed it, supra, no measure subject to the referendum can be withdrawn therefrom by a mere emergency clause. Nor should the people be denied their constitutional right of referendum, by a mere declaration of ''immediate preservation of the peace, health or safety,'' unless such declaration is borne out by the face of the measure itself. The courts have the right to measure the law by the yard stick of the Constitution, and determine whether or not the law-makers breached the Constitution in making the declaration. In the recent case of Attorney General v. Lindsay, 178 Mich. 1. c. 531, the court said:

''Courts have never refused to review acts of the Legislature in the exercise of a discretion, unless it explicitly appears that the grant of such discretion was exclusive, and the right to determine, in such a case,

the question as to whether the exercise of such discre-
tion by the Legislature has been a proper one is inherent
in the court as the final arbiter of constitutional and
statutory construction. This case is no other or differ-
ent from any other case which involves constitutional
construction, and it must be decided upon well-known
principles of law and the application of the ordinary
rules of such construction.

"As already stated, this section, without dispute,
was intended to be a restriction upon legislative action
and confined the legislative power and discretion to give
immediate effect only to the classes of legislation desig-
nated. The logical conclusion of the contention of re-
spondents (admitted by them upon the argument) that
the Legislature may determine that any act passed by
it may be given immediate effect, and that such de-
termination is final, wipes out and makes of no effect
the restriction intended by the people in adopting the
new Constitution. No ambiguity appears in the wording
of this section, and none is claimed by respondents. No
words are used from which any implication arises that
it was the intention to grant a specific delegation of pow-
er, the exercise of which would be final. In constitution-
al construction the rule always obtains that the intent of
the people is the intent to be ascertained and upheld.
It is for the courts to determine this intent, as express--
ed in the Constitution, and to construe acts of the Legis-
lature with reference to it. The construction urged by
respondents is not in harmony with the obvious intent
of the people to restrict the power of the Legislature
in the matter of giving immediate effect to its acts, and
therefore cannot be accepted."

In the above case the court was construing the fol-
lowing provision of their constitution:

"No act shall take effect or be in force until the
expiration of ninety days from the end of the session
at which the same is passed, except that the Legislature
may give immediate effect to acts making appropriations
and acts immediately necessary for the preservation of

the public peace, health or safety by a two-thirds vote of the members elected to each house.''

At page 539 of the opinion, the Michigan court thus concludes:

''Our conclusion is that this amendatory act, providing only for the amendment of existing city charters piecemeal, is in no sense a police act 'immediately necessary for the preservation of the public peace, health or safety.' The determination of the Legislature by giving it immediate effect is not conclusive upon the courts, and they must decide, as a matter of law, whether the act so declared is a police act, within this constitutional provision. This is clearly a judicial question. This act was not within the classification fixed by this constitutional provision, and the act of the Legislature in so determining was invalid.''

So that in the case at bar, had the law-makers in Section 81 of the measure actually declared such measure to be necessary for the ''immediate preservation of the peace, health or safety,'' we would hold such section void upon a comparison of the measure as a whole with the constitutional provisions of Section 57 of Article IV of the Constitution. The words ''Necessary for the immediate preservation'' as found in our Constitution must be given effect, and are of vital importance in measuring the legislative act by the Constitution. Many acts may be necessary to public peace, health and safety, yet not be ''necessary for the *immediate perservation* of the public health, peace or safety.'' The trial court erred in holding that this act fell within the purview of the excepted class named in the constitution.

VI. Passing now to the facts in the case, we can say, taking the findings of the special master, which were approved by the court, that there was no finding of

Withdrawal of Name.

sufficient to defeat the reference of the which was attached the measure itself, and measure. The parties signed a petition to such signers are in no position to question their signature fraud in the procurement of the referendum petition,

tures, any more than one could question the signing of a note which he did not read. What the signer could not question, these plaintiffs cannot question. So the lower court seems to have so treated .it.

After the time for filing the petitions had expired, and after the petitions had been filed with the Secretary of State, there were a number of the signers who indicated their purpose to withdraw their names. A few had so indicated before the time of the filing had expired. These indications were in response to post cards sent out by relator and plaintiffs. Of the former there were 671; of the latter, 5559. The former class directed their card to the Secretary of State. The latter authorized Westhues and Wood to withdraw their names. Such is the situation of the attempted withdrawals.

To our mind a single proposition eliminates both classes of the alleged withdrawals. To obviate fraud the statute (Sec. 6749, R. S. 1909) requires that each sheet of the petition shall be verified by the affidavit of the circulator of such sheet of the petition, in which affidavit such circulator shall give the names of the signers thereon and make oath that they signed it in his presence and other matters named in the statute, supra. The very purpose of the statute in requiring this formality was to obviate fraud. To get off of such a petition the action of the signer should be at least as formal. His request should at least be verified by his affidavit before some officer. This to the end that the Secretary of State might know that the signature to the request was genuine. A mere postal card or letter purporting to be signed by a signer of the petition is not sufficient. Such course would open wide the gates for fraud. These alleged withdrawals cannot be considered.

VII. The petitions come from twelve of the sixteen Congressional districts of the State. The law requires that there must be sufficient petitions from at least two-thirds of the Congressional districts, so that the peti-

Legal Voter:
Registration.

tions must be sufficient from at least eleven of the sixteen districts to secure the reference of the measure.. When we have eliminated the broad charges of fraud, as we have, and when we have disposed of the matter of withdrawals from the petitions, as we have, the record before us shows that there were at least nine Congressional districts in which there were good and sufficient petitions. As to the charges of fraud the master in chancery says:

"The allegations of fraud in the procurement of signatures to the petition, made by. the relator in his petition, were, by counsel for the relator in his closing argument before the master, which does not appear in the record, expressly abandoned, eliminated and withdrawn, except as to the allegation of fraud in the procurement of signatures to the petitions circulated in the .City of Columbia, Boone County, Missouri, in the Eighth Congressional District, and a disposition of this matter will be made and appear in the finding of facts hereinafter submitted."

They are likewise abandoned in this court. The three remaining are the 5th, 8th and 15th districts, and if two of these have the requisite petitions, the necessary eleven districts appear. The charges of fraud are insisted upon in the Eighth District, and we leave that out for the present. Now as to the facts of the 5th and 15th districts. The Fifth District had 3,785 signers to the petition. The necessary five per cent of the basic vote in that district was 2,523, so that there were in said district 1,263 more signers than was required, if they were all legal signers. In the Fifteenth District there were 2404 signers, and five per cent of the basic vote was 1888, so that there was 516 more signers than necessary in that district, if they were all legal signers. The master finds, upon somewhat questionable evidence, that:

"An examination of the registration books in those places made by plaintiffs shows that 2443 of the Kansas City signers and 1028 of the Joplin signers are not registered voters in the voting precinct or district

in which are situated the residence addresses stated opposite their names on the petition."

The first question squarely raised, is whether or not the signers of initiative and referendum petitions, must be registered voters, in order to qualify them to sign. The situation here was that many of the signers were returned soldiers, and whilst legal voters in every sense were not on the registration books in force at the time of their signing, but could register and vote upon this measure, as well as all other matters in November 1920. Others had changed their voting precincts by changing their residence from one precinct to another, in the same city. It is not questioned that these signers possessed the qualifications set out in Section 2 of Article 8 of our Constitution, which reads:

"Every male citizen of the United States and every male person of foreign birth who may have declared his intention to become a citizen of the United States according to law, not less than one year nor more than five years before he offers to vote, who is over the age of twenty-one years, possessing the following qualifications, shall be entitled to vote at all elections by the people:

"First, He shall have resided in the State one year immediately preceding the election at which he offers to vote.

"Second, he shall have resided in the county, city or town where he shall offer to vote at least sixty days immediately preceding the election."

In our judgment the words "legal voters" as used in Section 57 of our Constitution does not mean registered voters. Registration does not add to or detract from the qualifications of a voter. Such laws could not do so without doing violence to the Constitution. Such laws are but reasonable regulations for the orderly exercise of the constitutional rights of suffrage. They are intended to and do apply solely to the exercise of the constitutional right of suffrage, and not to the exercise of any other right which a legal voter may exercise. That these registration laws are mere police regulations

applicable to the act of voting only is made clear by the cases. In State ex rel. v. Mason, 155 Mo. l. c. 506, this court approved the following from the text of Judge COOLEY:

"The provision for a registry deprives no one of his right, but is only a reasonable regulation under which the right may be exercised. Such regulations must always have been within the power of the Legislature, unless forbidden. Many resting upon the same principle are always prescribed, and have never been supposed to be open to objection. Although the Constitution provides that all male citizens twenty-one years of age and upwards shall be entitled to vote, it would not be seriously contended that a statute which should require all such citizens to go to the established place for holding the polls, and there deposit their ballots, and not elsewhere, was a violation of the Constitution, because prescribing an additional qualification, namely, the presence of the elector at the polls. All such reasonable regulations of the constitutional right which seems to the Legislature important to the preservation of order in elections, to guard against fraud, undue influence, and oppression, and to preserve the purity of the ballot box, are not only within the constitutional power of the Legislature, but are commendable, and at least some of them are absolutely essential." [Const. Lim. (6 Ed.) pp. 757-8.]

And in the same case we likewise approved the following from McCrary on Elections (4 Ed.) sec. 137:

"The power to provide for the orderly exercise of the right of suffrage, which we have seen belongs to the State Legislature, includes the power to enact registry laws, and to prohibit from voting persons not registered. It is now generally admitted that these laws do not add to the constitutional qualifications of voters, and are therefore not invalid."

So that it can be safely said that such laws are but reasonable regulations protecting the right of suffrage, and relate solely to the exercise of that right. One may be a legal voter under the Constitution and yet cannot

vote, because he has not complied with these reasonable regulations for the exercise of the right to vote. But such laws would not prohibit such voter from exercising other rights granted him, as the signing of initiative and referendum petitions.

As has been previously stated in the course of this opinion, we borrowed our constitutional provision from the State of Oregon. That State has construed the term "legal voters' as used in their constitution providing for the initiative and referendum. In State ex rel. v. Olcott, 67 Oregon, l. c. 220, that court says:

"It is also alleged 'that 4861 of the alleged signers of said petition are not registered voters of the State of Oregon and therefore not entitled to vote on said measure and are not valid petitioners.' The Constitution does not require that petitioners for the referendum of a bill shall be registered voters. It is said: 'The second power is the referendum, and it may be ordered . . . either by the petition signed by five per cent of the legal voters, or by the legislative assembly, as other bills are enacted.' It has been settled by this court in Woodward v. Barbur, 59 Ore. 70, that it is not essential that a petitioner for the referendum or initiative of a measure shall be a registered voter. If it be true that the petitioner is a legal voter he is competent to sign such petitions."

And in Woodward v. Barbur, 59 Ore. l. c. 75, the same court said:

"1. Such regulation necessarily tends to prevent fraud in securing petitioners, but in our opinion the qualification of registration is an unwarranted restriction of the right to exercise the initiative power, guaranteed by the constitution to legal voters.

"2. Participation in the initiative of measure to be submitted to voters for their approval or repudiation is not an election wherein any choice is required to be made, but an initiative petition affords evidence of a desire on the part of a few persons that the expediency of a proposed law may be determined at the polls pursuant to notice thereof."

In the same case at page 77 the Oregon court thus concludes:

"Believing that the 800 or more petitioners who had not registered were prima-facie legal voters, and as such could have exercised the right on the day of the election by producing the requisite proof, which is tantamount to registration (Sec. 3463, L. O. L.) they are 'legal voters' as defined by the constitution, and hence the conclusion was reached that an error had been committed in overruling the demurrer."

To like effect is In Re Herman, 96 N. Y. Supp. 144, in which we find this language:

"Objection is also made that the signers upon some of the petitions are not registered voters. I do not think it was the intention of the statute to require that an elector or voter should be registered in order to join in a certificate of independent nomination. And while the words 'voter' and 'legally qualified voter or elector' are used in different places it may be fairly said to embrace a legally qualified voter. Without necessarily including his registry at the particular election, he must be legally qualified as an elector or voter at general and special elections within his district. But if he should neglect to register, and does not think that that is a qualification of an elector as used in the Constitution and fundamental statute of the state, and unless it would clearly appear that a statute regulating the conduct of elections intended to go to the disqualification of any particular elector or class of electors, such regulation ought not to limit the constitutional right of a voter. The statute was intended for the ordinary conduct of elections, *and not for the purpose of preventing citizens discharging their ordinary duties.*. It should be so construed as to permit such voters and electors as are recognized by the Constitution to take part in all the preliminaries of an election, and it is not necessary that he should declare his intention to vote at the election, or that he should actually intend to vote. It follows, therefore, that the objection to those signers that were not registered is not well taken."

In other words, the registration laws are police restrictions on the exercise of the voting privilege, and are not restrictions upon any other privilege granted by the organic law. As we view it, if the signer is otherwise a legal voter, the fact that he is not at the time of signing registered is not a bar to his right to sign either an initiative or a referendum petition. The trial court erred in holding that the petition was not sufficiently signed in the 5th and 15th Congressional districts.

VIII. A further holding of the trial court was to the effect that the petitions from the 11th and 12th Congressional districts should be excluded. This on the theory that neither the petition nor the affidavit showed in which one of the three Congressional districts of the city (there being at least two wholly within the city and one partially) the signers resided. The affidavit does state, as to the signers of the respective sheets of the petition, the following: "I believe that each [meaning signer] has stated his name, post office address, and *residence* correctly." Opposite the signer's name he placed the street number in the City of St. Louis at which he resided. The affidavit of the circulator says that he stated his residence address correctly. It was then proven that 2589 of these street addresses were in the Eleventh Congressional District, and 2519 were in the Twelfth Congressional District. These numbers made each petition good so far as the number of signers are concerned. The petition of the plaintiffs attacked the petition from these two districts, thus:

"And on the sheets of the said petition purporting to be from the 11th and 12th Congressional districts the verifications fail to show the Congressional district in which the signers of the petition are legal voters."

The whole petition of the plaintiffs shows that they had no trouble in picking out the petitions from these two districts, and distinguishing those of the Eleventh from those of the Twelfth. But the complaint in the petition goes to the sufficiency of the affidavit. The statute makes no such requirements for the affidavit.

[Sec. 6749, R. S. 1909.] This statute prescribes the form of the verification affidavit, and those involved here comport with this form. In fact they are a rescript of the statutory form. But in addition to the foregoing it appears in evidence that the petitions from the Eleventh District were, when filed with the Secretary of State, bound in one bundle, and marked "District 11." So also as to the Twelfth and all other districts from which petitions were obtained. Other evidence shows that the petitions from these districts came in the usual form prevailing since the adoption of our, constitutional provision. But it really suffices to say that the petition only attacks the sufficiency of the verification affidavits, in that such affidavits failed to state the Congressional districts of the voters, and that our statute makes no such requirement. The ruling *nisi* was wrong as to these two districts.

IX. A further contention, which affects a few petitions in several of the Congressional districts, is that the affidavit of the circulator was made before a notary public, who himself, had signed one sheet of the petition. There is nothing in this contention. The notary public, as a voter, signs the petition with other voters. The circulator makes affidavit before such notary that he (naming the notary, and the other voters) have signed the petition. This single signer of the petition (the notary public) has no such interest in the matter as would preclude him from administering the oath to the circulator of the petition. Such officer is allowed by law to administer the oath to such a person. We know of no law, either statutory or common, which would make this official certificate bad. The cases cited do not apply.

With this we have gone over the material contentions made by plaintiffs, most of which were sustained *nisi*. From it all we conclude that the trial court erred in this case. The finding and judgment should have been for the defendants, and the bill in equity of relator and plaintiffs should have been dismissed. The judg-

ment should be reversed, and judgment entered here dismissing the bill in equity of relator and plaintiffs, and at their costs, both here and in the court below.

It is so ordered. *Walker, C. J.,* concurs in separate opinion; *Blair, J.,* concurs in separate opinion, in which *Williams, Goode* and *Williamson, JJ.,* concur; *Woodson, J.,* concurs *in toto.*

WALKER, C. J. (concurring).—I concur in Paragraph One of the majority opinion in so far as it holds that the prosecuting attorney was not authorized to bring this action.

I concur in Paragraph Two, in that the interveners named, as citizens and taxpayers, were authorized to be made parties plaintiff, and that this action may be maintained in their names.

I concur in Paragraph Three, in that this action was prematurely brought against the Secretary of State and the Attorney-General.

I do not concur in the reasons urged or the conclusions reached in Paragraphs Four and Five, nor to my learned brother's conclusions deduced from the facts in Paragraphs Six, Seven, Eight and Nine, except in so far as it is held that a subsequent action may be brought herein and that the judgment must be reversed and the bill dismissed for the reasons stated in the first three paragraphs of the opinion.

BLAIR, J. (concurring).—I concur in Paragraphs I, II and III. In Paragraph IV I concur because we are bound by the construction given the Oregon Constitution by the Supreme Court of that State prior to our adoption of its provisions. With respect to Paragraph V, it is enough to say that the expressions in Section 81, therein referred to, do not indicate any intent to put the act in force under the "public peace, health or safety" clause of the referendum section of our Constitution. As to the "broader question," I express no

opinion. It cannot be involved in this case. In the remaining paragraphs I concur. *Williams, Goode* and *Williamson, JJ.,* concur.