**STATE of Missouri, Respondent,**

v.

**Richard Paul ANDERSON, Appellant.**

**No. 58543.**

Supreme Court of Missouri,
En Banc.

Nov. 12, 1974.

John C. Danforth, Atty. Gen., Mark D. Mittleman, Dan Summers, Asst. Attys. Gen., Jefferson City, for respondent.

Alan G. Kimbrell, Asst. Public Defender, Twenty-First Judicial Circuit, Clayton, for appellant.

FINCH, Judge.

Appellant was found guilty of murder in the second degree and sentenced to 60 years in the custody of the Missouri Department of Corrections. On appeal the Missouri Court of Appeals, St. Louis District, reversed and remanded for new trial but thereafter sustained appellant's motion to transfer to this Court because of the general interest or importance of questions involved in the case (pursuant to Rule 83.-02, V.A.M.R. and Art. V, § 10, Mo. Const. V.A.M.S.). We now decide the case as though here on direct appeal, but in so doing we utilize without quotation marks parts of the opinion written in the Court of Appeals by Judge Kelly. We reverse and remand.

Appellant was charged with first degree murder in killing Victoria Fisk. He pleaded both not guilty and not guilty by reason of mental disease or defect excluding responsibility pursuant to § 552.030.[1] The

---

1. All statutory references are to RSMo 1969, V.A.M.S. unless otherwise indicated.

trial court instructed the jury on both first and second degree murder but refused to instruct on manslaughter.

On July 15, 1967, appellant shot and killed Victoria Fisk. For some time prior thereto, appellant and Mrs. Fisk's daughter Pat had maintained an amorous relationship which was not sanctioned by Mrs. Fisk or her husband, Elbert Fisk. Appellant and Pat, although still married to others, lived together at different times, both in St. Louis County and in California. Their relationship was stormy. The record is replete with evidence that Pat was promiscuous in her amours and that appellant accused her of a lesbian relationship with one of her girl friends.

While appellant and Pat were living in California, the Fisks visited them and persuaded Pat to return with them to Missouri. Appellant thereafter urged Pat to rejoin him in California and sent her money for plane fare, but she did not return. He then came back to St. Louis County and for a few weeks lived at the Fisk home. He moved out when Pat told him she wanted to break up their relationship. Appellant became convinced that Pat's only salvation was psychiatric treatment, and he urged the Fisks to afford her such treatment but they did not.

On one occasion thereafter, appellant and a friend of his came to an apartment where Pat was visiting a girl friend and forced Pat to leave with him and go to a motel. He later let her go, but during the course of their conversation on that occasion, he told Pat that if she went to the police or had her parents press charges, he would kill her, her parents and her girl friend.

About a week later, on the morning of July 15, 1967, appellant came to the Fisk house. He was armed and ostensibly came for the purpose of conveying Patricia to a psychiatrist, by force, if necessary. Mr. Fisk went to the door when appellant knocked. Pat heard appellant's voice when he asked to see her. Mr. Fisk said, "No,

you're not going to see Pat" and told him that he wasn't welcome there. Appellant said again he wanted to see Pat, after which Pat heard a scuffling in the hall as though they were fighting. She then heard her stepfather say, "Oh, no!", followed by a shot.

Mrs. Fisk immediately ran to the telephone. Pat called to her mother to come with her and then ran from the house to a neighbor's garage. As she was running, she heard two more shots.

The police were called to the scene. When they arrived, they found Mr. Fisk lying in the front hall of the Fisk home. A trail of blood led to a neighbor's house where Mrs. Fisk was found in the hallway. Both had been shot, and both were dead. Appellant was not located at that time but was apprehended later in Canada.

After the shooting incident, Pat authorized police officers to intercept and read her mail. They obtained four letters written to her by appellant. Each contained admissions relative to the shooting and were received in evidence. In addition, two agents of the Federal Bureau of Investigation interrogated appellant while he was in custody in a jail in Toronto, Canada and they testified as to statements which he made to them.

Appellant called as witnesses Dr. Robert Thomas, a clinical psychologist, and Dr. Nathan Blackman, a psychiatrist. They testified that the appellant had a severe depression which was characterized as a mental disease or defect; that, as a result, he was unable to premeditate; and that in their opinion there was no premeditation in what appellant did. It is appellant's position that this evidence was admissible to show that he did not have a state of mind which is an element of the offense of murder in the second degree, namely, premeditation, and that such evidence would have justified the jury in finding that appellant intentionally killed Mrs. Fisk but that the killing was not premeditated.

It is apparent that the jury by its verdict rejected appellant's defense of not guilty by reason of mental disease or defect excluding responsibility. They also found lack of deliberation since they found appellant guilty of murder in the second degree rather than murder in the first degree. Since they were not instructed on manslaughter, they were not permitted to consider what effect, if any, should be accorded to appellant's evidence that by reason of mental disease or defect he was unable to and did not premeditate the killing—an element of the offense of murder in the second degree without which the offense would be reduced to manslaughter.

Appellant makes no contention that the evidence was insufficient to support a conviction of murder in the second degree. He asserts, however, that the evidence also entitled him to an instruction on manslaughter and that the refusal thereof by the trial court constituted reversible error.

The General Assembly has defined by statute what constitutes the offenses of murder in the first degree (§ 559.010), murder in the second degree (§ 559.020) and manslaughter (§ 559.070). The latter section defines manslaughter thus: "Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter."

This court has recognized that under the foregoing statutes, the elements in murder in the first degree are deliberation, premeditation and malice; that the elements of murder in the second degree are premeditation and malice but without deliberation; and that manslaughter is any other killing (not justifiable or excusable), which necessarily is without premeditation or malice. State v. Ayers, 470 S.W.2d 534 (Mo. banc 1971); State v. Williams, 442 S.W.2d 61 (Mo. banc 1968).

It is the duty of a trial court to instruct the jury in writing upon all questions of law arising in the case which are necessary for their information in arriving at a verdict. Sec. 546.070(4); Rule 26.02, V.A.M.R. If, as a matter of law, the court can declare that there is an entire absence of evidence upon which to support a verdict of guilty of a particular offense (whether it be murder in the first degree, murder in the second degree, or manslaughter), the court should not instruct thereon. Conversely, it is the duty of the court to instruct on such of these offenses as the evidence will support. State v. Ayers, *supra*. Hence, whether appellant was entitled to an instruction on manslaughter depends on whether from the evidence introduced the jury could have found that he unjustifiably and inexcusably killed deceased without premeditation or malice.

Historically, Missouri has rejected the so-called "partial responsibility" doctrine. That doctrine permits introduction of evidence of mental disease or defect to prove the absence of particular mental elements of a crime as a basis for convicting defendant of a lesser degree of the crime (instead of being acquitted on the basis of mental disease or defect). Typical of the cases rejecting the "partial responsibility" doctrine was State v. Holloway, 156 Mo. 222, 56 S.W. 734 (1900). In that case defendant charged with murder in the first degree, pleaded insanity as a defense. He asked for an instruction that defendant might be of sufficient mind to intend the murder of the deceased but not of such understanding and control of his mind and mental powers as to coolly deliberate said murder and that, if the jury so found, it should convict the defendant of murder in the second degree. This instruction was refused and that action was affirmed on appeal, the court saying, 56 S.W. l.c. 737:

"* * * If sane, defendant was indubitably guilty of murder in the first degree; if insane, of nothing. No halfway house exists, in a case of this sort, between murder in the first and any minor degree of that crime. Defendant, if sane, 'could coolly deliberate said mur-

der'; if insane, he could neither deliberate nor premeditate, and consequently was guiltless of the crime charged, and of any degree of that crime."

In 1963 Missouri adopted an entirely new act dealing with criminal proceedings involving mental illness (Chapter 552). In § 552.030(1) thereof, the statute provided that "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he did not know or appreciate the nature, quality or wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of law." Other subsections specified how and when the defense should be asserted, the notice to be given, the procedure to be followed and what would occur if the jury by its verdict should acquit defendant on the ground of mental disease or defect excluding responsibility.

After having provided in the above section for the defense of not guilty by reason of mental disease or defect excluding responsibility, the statute then provided in § 552.030(3) as follows:

"Evidence that the defendant did or did not suffer from a mental disease or defect shall be admissible

"(1) To prove that the defendant did or did not have a state of mind which is an element of the offense; or

"(2) For the purpose of determining whether or not the defendant, if found guilty of a capital offense, shall be sentenced to death or life imprisonment."

It is appellant's position (a) that under the specific provisions of § 552.030(3)(1) the evidence of Doctors Thomas and Blackman was admissible to show that appellant was not capable of and did not premeditate the killing of Mrs. Fisk and (b)

that, on the basis thereof, the jury could have found the defendant guilty of manslaughter rather than being limited to the choices of guilty of murder in the first degree, guilty of murder in the second degree, or not guilty by reason of mental disease or defect.

The state argues in response "that § 552.030(3)(1) does not mean that evidence of mental disease or defect can be used to negate some but not all of the state of mind elements of homicide. Respondent believes that the legislature intended that this statute mean only that the negation of one state of mind element of the offense charged would entitle the defendant to an acquittal by reason of mental disease or defect excluding responsibility."

Whether appellant was entitled to an instruction on manslaughter depends upon what interpretation is to be placed upon § 552.030(3)(1). In construing that section, it is important to consider its source which is § 4.02(1) of the Model Penal Code (ALI) (1962).[2] With reference to the meaning and purpose of that section, the drafters thereof stated in a commentary as follows:

"1. Paragraph (1) resolves an issue as to which there is a sharp division of authority throughout the country. Some jurisdictions decline for reasons of policy to accord to evidence of mental disease or defect an admissibility co-extensive with its relevancy to prove or disprove a material state of mind. See e. g. Fisher v. United States, 328 U.S. 463, [66 S.Ct. 1318, 90 L.Ed. 1382] (1946). We see no justification for a limitation of this kind. If states of mind such as deliberation or premeditation are accorded legal significance, psychiatric evidence should be admissible when relevant to prove or disprove their existence to

2. This is evident from the language of that section in the Model Code and is confirmed by a symposium on the new Missouri Act which was published in the Journal of The Missouri Bar. Missouri's Mental Responsibility Law. A Symposium: An Analysis of The Law, Richardson, Reardon and Simeone, 19 J.Mo.B. 645, 677, 696 n. 26 (Dec. 1963); 32 Mo.L.Rev. 274, 275 (1967).

the same extent as any other relevant evidence." [3]

■ It is reasonable to conclude that when the legislature decided in 1963 to incorporate § 4.02(1) of the Model Code into the new Missouri Act, it did so with the intention of adopting the accompanying interpretation thereof by the drafters of that provision. The rule is well established that when the legislature enacts into law a statute which they take from the laws of another state, they adopt the interpretation placed thereon by the courts of that state prior to the time the statute is enacted by Missouri. This rule was expressed in General Box Co. v. Missouri Utilities Co., 331 Mo. 845, 55 S.W.2d 442, 447 (1932) as follows:

"It should be noted that this construction of the Nebraska statute was placed thereon by the highest court of that state prior to its adoption here, and the law is well settled that, when one state adopts a statute of another state which the courts of that state have construed, then such construction will be held to have been adopted along with the statute. Schott v. Continental Auto Ins. Underwriters, 326 Mo. 92, 31 S.W.2d 7, 11; State ex rel. Westhues v. Sullivan, 283 Mo. 546, 578, 224 S.W. 327; Yost v. Railroad, 245 Mo. 219, 238, 149 S.W. 577."

The foregoing principle is just as logical and applicable when the new statute enacted is a model or uniform code rather than an existing statute taken from some other state except that the interpretation adopted is the commentary or explanation of the drafters rather than that of a court of the state from which the law is taken. Although this precise application of the principle has not been made heretofore in this state, the courts of other states have so held. For example, in People's Savings &

Trust Co. v. Munsert, 212 Wis. 449, 249 N.W. 527, 531 (1933), the court said:

"* * * The Uniform Conditional Sales Act, however, though adopted by the Legislature, was not in fact framed by it. The act was drafted by the Commission on Uniform Laws, submitted as drawn to the Legislature, and adopted by the latter without amendment. In construing a uniform law, the meaning of which is not clear, the intention of those who drafted it, if that intention may be ascertained, should be given controlling consideration, else the desired uniformity will not result. Futile, indeed, is the passage of uniform laws by the several states if the courts are to construe them differently."

See also Tinney v. Crosby, 112 Vt. 95, 22 A.2d 145, 147 (1941).

■ Adopting and applying the principle stated in People's Savings v. Munsert, we hold that when the General Assembly enacted § 4.02(1) of the Model Penal Code as § 552.030(3)(1) of the new Missouri Act, it adopted the interpretation placed thereon in the commentary by the drafters of the model act. That commentary makes it clear that the section was intended to make admissible evidence to prove the absence (due to mental disease or defect) of some element or elements of the offense charged and to accord to that evidence the same effect as other evidence (not based on mental disease or defect) which might be offered for that purpose. Applied to this case, that conclusion means that the jury was entitled to consider evidence on the absence of premeditation due to mental disease or defect the same as it would have been entitled, for example, to consider evidence to show absence of premeditation on the basis of sudden provocation.[4] A contrary conclusion would mean that the Gen-

---

3. The foregoing appears in tentative draft No. 4 (1955) of the Model Penal Code, p. 193, and is incorporated by reference in the Proposed Official Draft (1962), p. 67.

4. This interpretation is in harmony with that expressed in the Symposium on Missouri's Mental Responsibility Law cited in footnote 2, *supra*. See particularly 19 J.Mo.B., l. c. 655, 711.

eral Assembly in enacting § 552.030(3)(1) neither intended nor accomplished any change in the law as it had been declared in cases such as State v. Holloway, *supra.*

It should be pointed out that while the rule embodied in § 552.030(3)(1) as we interpret it is sometimes referred to as the doctrine of partial responsibility, the fact is that such a descriptive term is misleading and does not correctly state the purpose and effect of the rule. This was pointed out in State v. Padilla, 66 N.M. 289, 347 P.2d 312, 314 (1959), as follows:

"The doctrine contended for by the defendant is sometimes referred to as that of 'diminished' or 'partial responsibility.' This is actually a misnomer, and the theory may not be given an exact name. However, it means the allowing of proof of mental derangement short of insanity as evidence of lack of deliberate or premeditated design. In other words, it contemplates full responsibility, not partial, but only for the crime actually committed."

A similar view is expressed in an annotation in 22 A.L.R.3d 1228 entitled "Comment Note.—Mental or Emotional Condition as Diminishing Responsibility for Crime" where it is stated 1.c. 1238:

"* * * [S]everal states have adopted the so-called theory of diminished responsibility. This theory is that since certain crimes, by definition, require the existence of a specific intent, any evidence relevant to the existence of that intent, including evidence of an abnormal mental condition not constituting legal insanity, is competent for the purpose of negativing that intent. Although the doctrine is often referred to as the doctrine of 'diminished responsibility,' the actual purpose of such evidence is to establish, by negating the requisite intent for a higher degree of offense, that in fact a lesser degree of the offense was committed."

In urging that the court interpret § 552.030(3)(1) in a manner contrary to the views hereinbefore expressed, the state cites and relies particularly on the cases of State v. Holloway, supra; State v. Garrett, 391 S.W.2d 235 (Mo.1965); State v. Glenn, 429 S.W.2d 225 (Mo. Banc 1968); and State v. Sturdivan, 497 S.W.2d 139 (Mo.1973).

Holloway was decided in 1900, long before the enactment of § 552.030(3)(1). It does not purport to be and is not an interpretation of the meaning and effect of that statutory provision.

Garrett was a case in which the defendant was charged and convicted of first degree robbery committed with a dangerous and deadly weapon. He pleaded not guilty by reason of mental disease or defect. At the trial, defendant requested and the trial court refused an instruction which would have required the jury to find the defendant not guilty if at the time of the offense he "had a mental disease or defect sufficient to deprive him of ability to act willingly or feloniously." This court in affirming the conviction pointed out that the instruction was offered with a view of having the jury to return a verdict of not guilty without a finding of mental disease or defect excluding responsibility. In other words, as the court pointed out, 391 S.W.2d 1.c. 242:

"* * * [T]he desire was to have the jury find just enough 'insanity' to destroy any felonious intent, but not enough to constitute 'mental disease or defect' excluding responsibility which would require such a statement in the verdict and a resulting commitment. Sec. 552.030(6). This is an attempt to play somewhat 'fast and loose' with the statute."

Defendant in Garrett did not seek an instruction submitting guilt or innocence of a lesser degree of the crime based on evidence of the absence of some element of

the offense due to mental disease or defect. Hence, the decision in Garrett does not rule the issue presented here. However, reference is made in Garrett to the decision in State v. Holloway, and the fact that it refused to adopt the theory of "partial responsibility." The court then said, 391 S.W.2d l.c. 243:

"\* \* \* We adhere to that ruling, and we do not find that the adoption of the present Mental Responsibility Law requires or indicates the necessity of any change."

That statement was unnecessary to the decision and is dictum. In view of the result we reach herein, it is not a valid observation with respect to the meaning and effect of § 552.030(3)(1).[5]

In State v. Glenn, *supra*, a felony murder case arising out of the death of a police officer in connection with a robbery, this court held that the trial court properly refused to instruct on murder in the second degree. This decision was based on the proposition that § 559.010, supplies the elements of deliberation, premeditation and malice if the homicide was committed in the commission of one of the specified felonies and that only an instruction on murder in the first degree is appropriate. Defendant sought to avoid the effect of that rule by relying on § 552.030(3)(1). In disposing of that contention, the court said, 429 S.W.2d l.c. 234:

"\* \* \* Defendant seeks to avoid those decisions by referring to our new criminal insanity law and pointing to § 552.030, wherein it is said, in paragraph 3, that '[e]vidence that the defendant did or did not suffer from a mental disease or defect shall be admissible (1) to prove that the defendant did or did not have a state of mind which is an element of the offense \* \* \*.' As best we understand this contention it is that the evidence offered on the insanity defense created an issue as to whether defendant was sufficiently sentient to form the felonious intent necessary to constitute the offense of robbery which is relied on as a part of the felony-murder submission. No case is cited which discusses that question.

"Under the facts of this case we are unable to understand how the evidence concerning defendant's mental condition would warrant an instruction on second degree murder. The robbery and the homicide were both a part of one continuous occurrence. There is no evidence of any different mental condition existing at the time of the robbery than existed at the time of the killing. If defendant had sufficient mental capacity to appreciate the wrongfulness of his conduct as it might have related to murder in the second degree the same capacity would apply to robbery or murder in the first degree. In other words, it is our view that under the evidence in this case the mental disease, if found to exist, would warrant an acquittal but would not operate to reduce the offense from first to second degree murder."

It is our view that the instant case is not analogous to Glenn. In any event, that case does not cause us to reach a result herein contrary to the views previously expressed in this opinion. Glenn should not be construed as being authority for the proposition that a defendant is not entitled to an instruction on a lesser degree of a crime when there is evidence that by reason of mental disease or defect a state of mind which is an element of a higher degree of the offense is missing.

In State v. Sturdivan, *supra*, defendant was charged with first degree murder. He pleaded not guilty and not guilty by reason of mental disease or defect. The court instructed on first degree murder only and refused to instruct on murder in the second

5. See discussion and criticism of this phase of the Garrett decision in Comment, Mental Responsibility and The Criminal Law in Missouri, 35 Mo.L.Rev. 516 (1970) ; 32 Mo.L.Rev. 274 (1967).

degree and manslaughter. The case was affirmed on appeal, the court stating, 497 S.W.2d l.c. 142:

> " * * * Evidence of mental disease, if present (as suggested by defendant's plea of not guilty by reason of insanity), would not reduce the degree of homicide; but, if found, would call for acquittal. State v. Glenn, supra; State v. Holloway, 156 Mo. 222, 56 S.W. 734, 737 (1900)."

The result reached in Sturdivan appears to be correct, not because a defendant cannot be entitled to an instruction on a lesser degree of the crime based on evidence of the absence of some element of the offense due to mental disease or defect, but because there was no evidence to show mental disease or defect which would entitle the defendant to such an instruction. However, what the court says with respect to the degree of homicide not being reduced by reason of mental disease or defect showing the absence of some element of the offense is not in accord with § 552.-030(3)(1) as we interpret it and is disapproved.

▪ Having concluded that by the adoption of § 552.030(3)(1) the legislature adopted a rule of evidence making admissible evidence of the absence of premeditation in the case of a defendant charged with murder, it follows that where, as here, sufficient evidence thereof was introduced to permit the jury to conclude that defendant was not capable of premeditation, an instruction on manslaughter was mandatory and refusal of such an instruction was reversible error.

▪ Appellant has asserted numerous other grounds for reversal which we need not consider. Several assignments relate to instructions given or refused. We do not consider them in view of the fact that since the trial of this case, pattern criminal instructions, denominated MAI–CR, have been adopted. On retrial, instructions therefrom should be used. Other assign-ments relate to alleged prejudicial final argument to the jury on behalf of the state and to an objection to a hypothetical question asked of Dr. Thomas. Since these may not recur on retrial, we do not consider and rule on them.

There is one question likely to arise on retrial which we should decide. That relates to admissibility of testimony by Federal Bureau of Investigation agents as to statements made to them by appellant when they interrogated him. Appellant's specific assignment with reference thereto is that the evidence was inadmissible because the agents did not inform him of his right to the presence of an attorney prior to and during any interrogation and because he did not waive his right to remain silent or to an attorney.

The trial court, out of the presence of the jury, held an evidentiary hearing on appellant's motion to suppress his statement to the FBI agents. At said hearing, an FBI agent testified that prior to questioning, appellant was told that he did not have to talk to them if he did not so desire; that anything he said could be used against him in a court of law; that he was entitled to an attorney if he desired one; and that if he was unable to obtain an attorney by reason of finances or otherwise, arrangements would be made to have one assigned to him. In addition to that verbal warning, the defendant also was shown a standard Miranda card which, among other things, contained the following with respect to this particular contention:

> "You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

> "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

> "If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop

answering at any time until you talk to a lawyer."

According to the agent, appellant looked at this card and said that he understood his rights. He then stated that he would not sign the card or a waiver and wouldn't sign anything but he would talk about things. The appellant also testified, and he disputed portions of the testimony of the agents.

Upon the evidence which it heard, the trial court overruled the motion to suppress, holding that statements made by appellant were given after he had been advised of his rights and after he indicated that he understood them. The court held that appellant waived his rights by voluntarily making statements to the FBI agents.

We hold that there was ample evidence to support the findings and conclusions of the trial court and that the hearings and findings thereon complied with the requirements of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967). Consequently, we hold that admission of the testimony of the FBI agents with reference to appellant's statements to them was not erroneous.

Reversed and remanded.

DONNELLY, C. J., and SEILER, MORGAN, HOLMAN and BARDGETT, JJ., concur.

HENLEY, J. dissents in separate dissenting opinion filed.

HENLEY, Judge (dissenting).

I respectfully dissent because I cannot agree that there was any substantial evidence to support the giving of a manslaughter instruction.

The principal opinion holds that a manslaughter instruction should have been given because there was evidence from two doctors that defendant was unable to premeditate because of "severe depression" and in their opinion "there was no premeditation in what appellant did." I agree with the statement in the principal opinion that manslaughter consists of an intentional killing without premeditation or malice, but that broad statement presupposes a substantial reason producing the absence of premeditation. It has been said that voluntary manslaughter is the intentional killing of a human being in a heat of passion on a reasonable provocation, because these mitigating factors (heat of passion reasonably provoked) eliminate the element of premeditation and reduce the offense from murder to manslaughter. But the court has never recognized, so far as I can determine, that mere depression is capable of producing the same effect as "anger, fear or agitation suddenly provoked by the unexpected acts or conduct of the victim." See MAI–CR [1] 6.06 and 6.08. I doubt that the court should recognize mental depression as a factor having the potency to eliminate the ability to premeditate in the absence of more definitive and persuasive evidence. Until it is produced and so recognized I can not agree that there is such substantial evidence in this case as would require the giving of a manslaughter instruction.

[1]. Missouri Approval Instructions—Criminal.