STATE of Missouri, Respondent,

v.

Barry J. WEATHERSPOON, Appellant.

No. WD 37201.

Missouri Court of Appeals,
Western District.

July 29, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 28, 1986.

Application to Transfer Denied
Oct. 14, 1986.

Sean D. O'Brien, Public Defender, David S. Durbin, Asst. Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Timothy W. Anderson, Asst. Atty. Gen., Jefferson City, for respondent.

Before CLARK, C.J., and TURNAGE and KENNEDY, JJ.

TURNAGE, Judge.

Barry J. Weatherspoon was found guilty by a jury of capital murder, § 565.001, RSMo 1978 (repealed effective October 1, 1984), and upon the jury being unable to agree upon punishment the court sentenced him to life imprisonment without eligibility of parole until he had served a minimum of 50 years.[1] Weatherspoon raises a number of points relating to qualification of a juror, admission of evidence, and the instructions. Affirmed.

Weatherspoon had been dating the victim, Roberta Loy Hearn. Hearn, however, informed Weatherspoon she was going to end the relationship. Weatherspoon became upset and tried to talk with Hearn, but she indicated she did not want to talk with him.

Hearn lived with Michelle Marion in an apartment at the Colonial Estates Apartments in Raytown, Missouri. Both were employed by AT&T as long distance operators. On February 8, 1984, Hearn left her apartment shortly after 7:00 a.m. to go to work. Her car was parked in the lot opposite the walk and door leading to the hallway where her first floor apartment was located. Shortly after Hearn left the apartment, Marion heard a car honking and went to the hall door leading to the parking lot and opened it. She saw Hearn sitting in her car and Weatherspoon standing on the sidewalk with a shotgun. Hearn was moving around in the car and Weatherspoon was moving the gun to keep it aimed at Hearn with each movement.

Marion shouted to Weatherspoon to stop and Weatherspoon turned around and fired toward Marion, striking her in the chest. When Weatherspoon shot Marion, Hearn got out of her car and started running. As she did so a car arrived in the parking lot to pick up a girl who was going to high school. Hearn ran up to the girl and pled for help and tried to get into the car. Before Hearn could enter the car Weatherspoon caught up with her and shot her in the neck. The shot passed through Hearn's hand and neck and broke a window in the car she had been trying to enter. After being shot Hearn fell to the pavement. Weatherspoon stood over her and reloaded his single shot shotgun, placed the barrel of the gun by her right ear and pulled the trigger. The blast blew off the top of Hearn's head and blew most of her brain out. Weatherspoon again reloaded the gun and fired, this time striking Hearn in the lower back.

Weatherspoon was observed by a number of witnesses who said that after Weatherspoon shot Hearn, he calmly walked away from the body and got in his car. As he left the parking lot he passed Hearn's body.

Weatherspoon testified and stated that he had borrowed a friend's car to go to Hearn's apartment. He used a borrowed car so that Hearn would not know that he was around because she would recognize a Triumph which Weatherspoon had been driving. Weatherspoon stated that he had purchased the shotgun a year or two before the shooting. Other evidence indicated that Weatherspoon had made inquiry concerning the type of shot to be used in the shotgun so that the ammunition would kill and not just wound.

Although not contained in the record, it appears Weatherspoon filed a notice that his defense was to be not guilty by reason of mental disease or defect. Two psychologists and a psychiatrist testified but none gave an opinion that Weatherspoon suffered any mental disease or defect within the meaning of Chapter 522, RSMo 1978. A psychologist who had examined Weatherspoon at his request testified that Weatherspoon was emotionally upset over the termination of the relationship by Hearn and

---

1. Weatherspoon was also charged with assault in the first degree and armed criminal action. On his motion those charges were severed from the capital murder charge.

that his emotions had overcome his reason at the time he killed Hearn. However, the psychologist did not believe Weatherspoon was suffering from any mental disease or defect.

Weatherspoon first contends the court erred in permitting the venire to be questioned regarding their attitudes concerning the death penalty and in striking those who said they could not vote for the death penalty. This contention has been raised and rejected by the Missouri Supreme Court on a number of occasions, the most recent in *State v. Roberts,* 709 S.W.2d 857 (Mo. banc 1986). It has now been rejected by the U.S. Supreme Court in *Lockhart v. McCree,* — U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

■ Weatherspoon next contends the court erred in failing to sustain a challenge for cause against venireman Anderson. Weatherspoon contends that Anderson had prior knowledge of the offense from a police officer, fellow workers, the newspaper and knew the trial judge and a state's witness. A review of the examination of Anderson reveals that she obtained no knowledge of the crime from the police. This contention along with the contention that she knew a state's witness apparently refers to the fact that she was familiar with the name of Detective Zubeck of the Raytown Police Department. However, Anderson said that she did not know Zubeck but that her husband did know him. There was nothing to indicate that she had heard anything about the crime from Zubeck either directly or indirectly. Anderson worked for AT&T but there was no indication of whether or not she worked in the same building as Hearn or was acquainted with her. She stated that she had heard some talk at work but she could set aside anything that she had heard and decide the case on the basis of the evidence presented in court and the instructions. She also stated she had read about the case in the newspaper but had not formed an opinion. She stated that she knew the trial judge but this would not affect her.

After being examined by counsel and the court Anderson stated unequivocally that she could reach a verdict solely on the evidence as presented in court and the law as given by the judge. It is beyond question that the trial court has a wide discretion in determining the qualifications of a venireman and that decision will not be disturbed absent a clear abuse of discretion and a real probability of injury. *State v. Smith,* 649 S.W.2d 417, 422 (Mo. banc 1983), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). Although Weatherspoon makes broad statements concerning Anderson, a review of her examination does not reveal any ground which would support her removal for cause. Anderson stated she had lived in Raytown for over 20 years but like the other contentions, this would supply no ground for disqualification absent a showing that she was unwilling or unable to be a fair and impartial juror. There was no abuse of discretion in failing to sustain the challenge for cause to Venireman Anderson.

■ Weatherspoon next contends the court erred in admitting in evidence the blood soaked clothing of Hearn, photographs of the body of the victim, and a photograph of the automobile showing a window broken. The contention is that these items were inflammatory and that the photographs are extremely obscene, offensive, and vulgar. Weatherspoon states that he offered to stipulate to the nature and location of the wounds and that this obviated the necessity for introducing the pictures. In *State v. Clemons,* 643 S.W.2d 803, 805 [1–3] (Mo. banc 1983), the court stated that even though the defendant may have offered to stipulate to the cause of death the right of the state to offer relevant and material evidence cannot be taken away by such an offer. The court further stated that the admission of photographs was discretionary and erroneous only if the ruling resulted in fundamental prejudice and an abuse of discretion. The court added that if the photographs tend to be shocking and gruesome it is because the crime is of that sort. The court concluded that

accurate portrayals will always be inflammatory and the photographs there involved were no more gruesome than any photographs which would depict persons burned to death.

In this case a number of photographs of the body were offered but the court excluded most of them except the photographs showing the body in the parking lot and on the morgue table. One photo shows the body lying on the parking lot with a part of the head missing. It also shows a large mass of brain a few feet away. The other photo taken in the parking lot shows the body from the back. There is nothing inflammatory about it. The photograph taken in the morgue shows the lower torso with a hole in the lower part and also shows the right hand which was shot. The exhibits corroborated the testimony of the medical examiner and the police as to the appearance of the body and its location in the parking lot. The fact that oral testimony described the facts portrayed in the photographs is no reason to reject the demonstrative evidence if it is otherwise relevant. *Id.* at 805 [4–6]. The photographs were relevant and two of them could be described as gruesome. However, the killing by use of a 12 gauge shotgun was a gruesome crime. The photos enabled the jury to see exactly what wounds were inflicted and to observe their effect. No more pictures were admitted than necessary to aid the jury in understanding the facts. Weatherspoon is in no position to complain that because the crime was gruesome no pictures which depict his actions could be shown. There was no abuse of discretion demonstrated in admitting the clothing and photographs.

Weatherspoon contends that the court erred in allowing Tamara Pohman and Bruce Varner to testify and to identify a card containing the fingerprints of Weatherspoon taken by Pohman. Pohman, a records and detention clerk with the Raytown Police Department, took the fingerprints of Weatherspoon by rolling them on a card. Varner was a detective with the Raytown Police Department and testified

concerning a photographic enlargement of Weatherspoon's fingerprint. The fingerprint on the card was compared to one taken from a shell casing found in the parking lot.

The objection to both witnesses and the exhibit was that Pohman was not endorsed as a witness and Varner and the fingerprint card had not been disclosed to the defense in response to a request for discovery. Rule 23.01(f) does not require the names of witnesses who will appear for production or identification of public records to be endorsed. In *State v. Brauch,* 529 S.W.2d 926, 928 [3] (Mo.App. 1975), the court held it was not error to permit a police officer to testify that a fingerprint card had been prepared by him and that it was a record of the police department even though the officer had not been endorsed as a witness. Here it is clear that although Pohman actually rolled the fingerprint on the card, she testified primarily as the custodian of the record for the purpose of identifying the card. Under the rule she was not required to be endorsed as a witness.

As to the testimony of Detective Varner, the state disclosed to the defense five days before Varner testified that the state intended to call Varner and to introduce the blowup of the fingerprint card and to have Varner match the fingerprint found on the shell casing with Weatherspoon's fingerprint from the card. Defense counsel met with Detective Varner on the day he was disclosed and viewed the card and was free to ask Varner any question she desired. No attempt to depose Varner was made and no claim of surprise is now made. The only claim is that the state failed in its initial response to the request for discovery to reveal Varner and the card. In *State v. Sykes,* 628 S.W.2d 653, 656 [8, 9] (Mo.1982), the court stated that the question is basically whether the state's failure to provide discovery resulted in fundamental unfairness or prejudice to the substantial rights of the defendant. Weatherspoon admitted killing Hearn so it cannot be said that he was in any way prejudiced by a failure to

reveal that the state had a fingerprint from a shell casing which matched Weatherspoon's fingerprint. Indeed no attempt is made to demonstrate prejudice but only that broad conclusion is drawn because the state failed to disclose Varner. In view of the opportunity counsel had to interview Varner and make any preparation desired before he testified and the admission that Weatherspoon shot Hearn there could be no reasonable assertion that prejudice had resulted. There was no error in allowing the testimony of Varner.

■ Weatherspoon further contends the court erred in refusing to allow a psychologist to express an opinion on the question of whether Weatherspoon was able to conform his conduct to the requirements of the law at the time of the shooting. The state objected on the ground that the opinion would have to be based on the existence of a mental disease or defect.

The defense concerning Weatherspoon's mental condition was not that he was suffering from a mental disease or defect. Rather, it was that he suffered some impairment in his mental faculties as the result of growing up with an alcoholic father and because of the emotional experience of Hearn terminating their relationship. The result sought to be drawn was that he was unable to form the necessary intent to commit capital murder. Weatherspoon relies on a doctrine sometimes referred to as diminished or partial responsibility. As pointed out in *State v. Anderson*, 515 S.W.2d 534, 540 (Mo. banc 1974), that term is misleading. Actually the term refers to the fact that a person may not be suffering from a mental disease or defect to the extent that it would exclude responsibility for the crime entirely but as a result of such disease or defect the person might not be capable of forming the requisite intent to commit a certain crime. The holding of *Anderson* is that a defense of incapacity to form a specific intent must be based on the existence of a mental disease or defect. *Id.* at 539 [5–7].

Here Weatherspoon sought to show that he was incapable of forming the necessary intent to commit capital murder by showing the circumstances of his earlier home life and the emotional trauma of his breakup with Hearn. The question to which the court sustained an objection and which is now claimed to be error did not seek to elicit an opinion of whether or not Weatherspoon was suffering from a mental disease or defect but sought to base a defense on his emotional state. The defense sought to be asserted by Weatherspoon of incapacity to form the necessary intent must be based on the existence of a mental disease or defect. Because Weatherspoon did not base his defense on that ground, the court properly sustained the objection to the question posed to the psychologist.

In his next complaint Weatherspoon makes an attack on the instructions based on the same defense of incapacity to form a specific intent to kill because of his emotional upset. Although there was no evidence that Weatherspoon was suffering from mental disease or defect the court gave instructions which allowed the jury to find Weatherspoon not guilty if it found he was suffering from a mental disease or defect. Likewise, the court gave an instruction immediately following the capital murder instruction which advised the jury that evidence that Weatherspoon did or did not have a mental disease or defect could be considered in determining whether he had or did not have the state of mind required for capital murder as that element of the crime was set out in the verdict director. The instruction further advised the jury that after considering all of the evidence, including evidence that he did or did not have a mental disease or defect, if it had a reasonable doubt that Weatherspoon acted after considering the taking of the life of Hearn and reflecting upon this coolly and fully then the jury was to find him not guilty of capital murder. The effect of this instruction was to give Weatherspoon more than he was entitled to under the evidence because absent evidence of the existence of a mental disease or defect he was not entitled to an instruction submitting a defense based on mental disease or defect. *State*

*v. Foerstel,* 674 S.W.2d 583, 592 (Mo.App. 1984).

Nevertheless Weatherspoon contends the instructions were erroneous because Instruction No. 5 told the jury that Weatherspoon had denied that he was guilty and that even if the jury found him guilty beyond a reasonable doubt that he was entitled to a verdict of not guilty by reason of mental disease or defect excluding responsibility if the jury found he had such disease or defect at the time of the conduct with which he was charged. The instruction further told the jury that Weatherspoon was presumed to have been free of such mental disease or defect and the burden was on him to prove by the greater weight of the credible evidence that he was not guilty by reason of such disease or defect. Weatherspoon contends that by advising the jury that he was presumed to be free of such disease or defect the burden of proof concerning his mental state was impermissibly shifted to him. This contention was rejected by this court in *State v. Burton,* 544 S.W.2d 60, 64 [3, 4] (Mo.App.1976), *aff'd,* 641 S.W.2d 95 (Mo. banc 1982). In that case this court relied on *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), in holding that there is no constitutional requirement that the state bear the burden of proving the sanity of a defendant in a criminal prosecution. *Leland* approved a statute which required a defendant who relied on a defense of mental disease or defect to prove beyond a reasonable doubt that he was so suffering at the time of the offense.

Weatherspoon seeks to avoid the holding in *Leland* by relying on *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). *Winship* held that proof beyond a reasonable doubt must be shown in juvenile proceedings. *Sandstrom* and *Francis* involved instructions that told the jury that a person intends the ordinary consequence of his voluntary act when the defense was

that the act was the result of an accident. In those cases the court held that a reasonable juror could be confused by the instruction stating the existence of a presumption as to an element of a crime when the state was required to prove all elements of the crime beyond a reasonable doubt.

■ Here Weatherspoon contends the instruction stating that he was presumed to be free of mental disease or defect could have been taken by the jury to mean that Weatherspoon was presumed to have the requisite mental capacity to form the intent to take the life of Hearn and to reflect upon that matter coolly and fully. The presumption stated in the instruction concerning mental disease or defect bears no resemblance to the instruction concerning the presumption in *Sandstrom* and *Francis.* Here the presumption was clearly stated to extend only to the fact that Weatherspoon was presumed to be free of mental disease or defect. In addition the court followed the capital murder instruction with an instruction which clearly told the jury that it could find that Weatherspoon did not have the required mental capacity to form the intent to kill Hearn if it found the existence of a mental disease or defect. In addition to the instruction on capital murder the court instructed the jury on second degree murder and manslaughter. Each of those instructions was followed by an instruction which told the jury that if it found that Weatherspoon had a mental disease or defect that it could find him not guilty by reason of a mental disease or defect excluding responsibility.

Under *Leland* the state could place the burden of proving the existence of mental disease or defect on Weatherspoon as it did by § 552.030.6, RSMo 1978. A reasonable juror reading the instructions would not allow the presumption that Weatherspoon was free from mental disease or defect to overcome the requirement that the state was required to prove that Weatherspoon intended to cause the death of Hearn and

that he reflected upon that matter coolly and fully.[2]

Weatherspoon contends that the court erred in failing to declare a mistrial after the prosecutor stated in closing argument "there has never been so much evidence of premeditation in any case that I have ever heard of as in this [case]." After the statement was made an objection was sustained and the jury was instructed to disregard the statement. The court refused a request to declare a mistrial. The action of the trial court invokes the rule quoted in *State v. Scrivner*, 676 S.W.2d 12, 14 [1, 2] (Mo.App.1984), from *State v. Dennison*, 428 S.W.2d 573, 577 [2–4] (Mo.1968), to the effect that when improper evidence comes into a case, but is promptly stricken by the court and the jury is instructed to disregard it, the reviewing court must determine as a matter of law whether the error was prejudicial and so impressive that its effect was not removed by the action of the trial court. This court has no hesitancy in finding that there was no prejudice which was not removed by the prompt action of the trial court.

Weatherspoon finally contends that the court erred in giving the instruction defining reasonable doubt contained in MAI–CR2d 1.02 and 2.20. Reasonable doubt is defined as proof that leaves the jury firmly convinced of the defendant's guilt. Review of this contention is based on plain error since the matter was not raised in the motion for a new trial. An instruction in the format of MAI–CR will not be deemed to be error. *State v. Newlon*, 627 S.W.2d 606, 614 [8, 9] (Mo. banc 1982). This court does not find any manifest injustice resulting from this instruction which would constitute plain error.

The judgment is affirmed.

All concur.

---

2. The court gave the jury instructions allowing them to find Weatherspoon not guilty by reason of mental disease or defect which excluded responsibility or which diminished his capacity to form a specific intent when the evidence did not justify the giving of any of these instructions. The submission was more favorable to Weatherspoon than warranted by the evidence and as such he has no standing to complain. *State v. Olinger*, 396 S.W.2d 617, 620–21 [2, 3] (Mo. 1965). This court has nevertheless considered Weatherspoon's claim that the instruction was erroneous.